STATE of Oklahoma ex rel. OKLAHOMA BAR ASSOCIATION, Complainant,

v.

William Howard (Pat) O'BRYAN, Respondent.

S.C.B.D. 1792.

Supreme Court of Oklahoma.

June 18, 1963.

Rehearing Denied Sept. 10, 1963.

Application for Leave to File Second Petition for Rehearing Denied Oct. 29, 1963.

John L. Smith, Oklahoma City, for complainant.

William D. Fore, Oklahoma City, for respondent.

WILLIAMS, Justice.

The question to be determined herein is whether this Court will approve a report of the Oklahoma Bar Association and follow its recommendation that respondent be disbarred from practicing law.

This matter was first brought to the attention of the Bar Association when a Judge of the Federal Court for the District including Oklahoma City, on November 12, 1958, wrote a letter to the Bar concerning respondent's conduct for which he has been barred from further practice in that court.

Respondent had, on March 24, 1958, filed a "proof of debt" in the case of the Bankruptcy of Selected Investments Corporation and Selected Investments Trust claiming that Selected owed him $1,194;-

027.02 for the reasonable value of legal services performed at the bankrupt's request, most of which allegedly became due on November 18, 1957, and the balance shortly thereafter, and that he had received no sort of security or note or other evidence of the existence of the indebtedness. An exhibit attached to the claim asserted entitlement to 10% of certain tax savings to Selected.

Respondent had thereafter and on May 21, 1958, filed an amended proof of debt asserting that the debt claimed was "based upon an oral contract which was reduced to writing on October 29, 1954," and "further evidenced by a memorandum agreement dated May 17, 1957," and had attached copies of these two letters as exhibits.

On or about March 3rd to 7th, 1958, and before filing that original claim, respondent had talked by telephone to the Trustee in Bankruptcy and had been told by him that Mr. Carroll's testimony would not be very good to support an oral contract. It was after that (and within some two months from the time of filing of his original claim as above noted) that respondent "found" the purported written contract hereinafter described.

In the hearing before the Trial Examiner from which arose the recommendation presently under consideration herein, the Trustee in Bankruptcy testified repeatedly that respondent called him on the telephone different times after he had been designated as such Trustee and told him that respondent had an oral contract for fees; that it stuck in the trustee's mind immediately that respondent had been operating for a number of years under an oral agreement to represent someone; that he told respondent he would have been better off if he had had a written contract; that he did not instruct respondent "prior to his filing an original claim that it would be much easier for him to have a written contract as distinguished between an oral contract."

Respondent wrote the Trustee in Bankruptcy on March 10, 1958, and before filing his original claim, a thirty-two page letter in explanation of his claim soon to be filed. Therein, (page 4), he stated:

"Inasmuch as neither the officials of the company or ourselves could foresee the extent of the difficulties with which we might be confronted, no agreement could be reached as to the legal fees to be charged. It was understood that our compensation would be based upon a 'reasonable fee' which would be contingent, to some extent, upon the results accomplished.

"I explained to Mr. Carroll that I could not abandon my practice, which had been built over a period of many years, for the sake of any one client; also, that I could not, under the circumstances, determine what would be a reasonable retainer.

"The question of the legal fees to be charged was held in abeyance to be determined, when the results were in, on a reasonable basis with the understanding that in the interim Selected would from time to time allow us reasonable advances, in the form of retainer, to assist us in carrying the costs of our office and correspondingly the cost of carrying on this litigation."

On page 14 of that letter Mr. O'Bryan listed specifically the dates of some 12 or 15 conferences with taxing authorities. On page 22 of that letter he stated:

"We maintain an I.B.M. punched card system and will be able to furnish you with a tabulation of the number of hours devoted to this task. It is my estimation that the time devoted to the Selected tax matters will be in excess of 8,000 hours."

Referring to the Oklahoma State Income Tax angle of Selected's business, on page 28 of that letter, Mr. O'Bryan wrote:

"The fee arrangement in this matter was similar to that in the federal case. In other words, our compensation was to be a 'reasonable fee' based upon the results attained."

Yet he made no mention of the purported letter-agreement of October 29, 1954, in such entire letter of March 10, 1958, to the Trustee in Bankrupcty.

In that same letter of March 10, 1958, to the Trustee in Bankruptcy, to which reference was above made, respondent, at pages 22 and 23 thereof quoted two paragraphs from Am.Jur., Vol. 5, Attorneys at Law, IX, Compensation of Attorneys, E, Measure of Compensation or Recovery, § 198, Under Implied Contract, of effect as follows:

(That) "In the absence of an express contract of employment between an attorney and his client fixing the amount of the attorney's compensation, it is generally held that the attorney is entitled to what his services are reasonably worth, or what has usually been paid to others for similar services. The determination of this depends largely upon the circumstances of the particular case; * * *"

and listing numerous circumstances to be considered in fixing amount of an attorney's fee. On page 31 of that letter he stated that that "quotation * * * eloquently set forth the basis upon which our claim for 'reasonable compensation' is based."

As noted above, respondent herein was the claimant in the Selected Bankruptcy case. His claim came on for hearing in the Federal Court on November 3, 1958. A special master had been appointed in the case. However, the Judge of the Court recessed a jury trial and heard the matter personally. Respondent was given an opportunity to testify concerning the validity of his amended claim and the trustee in bankruptcy, who had been appointed by such Court, contested the validity thereof.

The letter of October 29, 1954, being complainant's Exhibit 23 herein and plaintiff's Exhibit No. 36 in the Federal Court Proceeding wherein respondent sought to establish his claim as amended, and which was attached to his amended proof of debt as Exhibit "B" is as follows:

"Law Office of

"O'Bryan And O'Bryan
"Hightower Building
"Oklahoma City, Oklahoma

"CEntral 2–6151

"W. H. Pat O'Bryan   October 29, 1954
"W. Howard O'Bryan, Jr.
"Donald L.
O'Bryan              CONFIDENTIAL

"Mr. Hugh A. Carroll,
312 Park Avenue
Oklahoma City, Oklahoma

"Dear Mr. Carroll:

"This will confirm my understanding of the agreement reached by us relative to our representation of the Selected Investments group in the Federal Income tax matters now pending and the compensation to be paid to us in relation thereto.

"It is our understanding that we are to render whatever legal services may be required of us in connection with these matters—including all years in which the issues raised may be involved, to the end that the income tax problems of the Selected group may be brought to a current status.

"At the time of our employment it was impossible to anticipate what might be required of us—at that time it was agreed that this matter would be held in abeyance until an intelligent approach could be made to the subject.

"A few days ago we reached an agreement as to the compensation to be paid to us, which you have asked that I confirm to you; my understanding of this agreement is as follows:

"1. We are to receive a total fee equal to 10% of the amount of the tax savings. The term 'savings' is to mean the total amount which the government would collect under their theory of the cases minus the amount of tax that might ultimately be paid.

"2. We are to receive reasonable retainer advances from time to time as the work progresses; the amount of the retainer paid to us shall constitute the minimum fee.

"3. Selected is to reimburse us for reasonable costs advanced by us— such as filing fees, court costs, printing, photostats, traveling expenses, etc. Such expense reimbursements are not to be charged against our fee.

"If the foregoing conforms to your understanding, please sign the enclosed copy of this letter and return the same to us.

"Yours very truly,
"/s/ W. H. Pat O'Bryan
"W. H. Pat O'Bryan

"This is my understanding of our agreement.
"/s/ Hugh A. Carroll
"Hugh A. Carroll"

In the Federal Court hearing both the Judge and counsel for the trustee questioned respondent concerning his claim for fees and at an adjourned session on November 10, 1958, the Judge announced a finding that the evidence clearly established that the March 24, 1958, claim and May 21, 1958, amendment thereto were fraudulent; found Mr. O'Bryan's sons had no responsibility with reference thereto and absolved them; granted the Trustee in Bankruptcy judgment on a counter claim for return of $5,000.00 or half of a $10,-000.00 payment that had been made to Mr. O'Bryan as expense money or advancement on fee for work on the tax problems Selected had with the Oklahoma Tax Commission; denied other relief sought by the Trustee; and orally announced that he was barring respondent from practicing ever again in that Court and that it was his "duty to notify the Oklahoma Bar Association of the facts * * * for whatever action they care to take." Two days later he wrote to the Bar Association the letter to which we have hereinabove referred.

The Executive Council of the Oklahoma Bar Association assumed original jurisdiction of the matter, authorized the filing of a formal complaint, designated Mr. Floyd L. Rheam of Tulsa, Oklahoma, one of its members, to hear the matter for the Executive Council, and designated Mr. John Lee Smith, as attorney of Oklahoma City, Oklahoma, as prosecutor for the Bar Association.

A complaint, attested by the Executive Secretary of the Bar, but not sworn to, was signed by Mr. Garrett Logan, then President of the Oklahoma Bar Association. Therein it was alleged that Mr. O'Bryan on the respective dates above shown had filed said proof of debt and amended proof of debt in the Selected Bankruptcy case; that both of such instruments were false and fraudulent and were "filed by the said respondent for the purpose of misleading said Court;" that such acts constituted professional misconduct, a breach of the respondent's oath of attorney at law and were "in direct violation of Canons 22 and 29 of the Canons of Ethics adopted by the Supreme Court of the State, * * *" etc.

Respondent denied the charge in his answer and by motion asked that the proceedings be made public. Such motion was granted.

The case came on for trial on March 2, and 3, 1959, before Mr. Floyd Rheam, Trial Examiner. Some of the Federal Court proceedings and exhibits and some depositions were received in evidence, the testimony of witnesses for the respective parties adduced and argument on their behalf presented.

Complainant at the conclusion of the taking of evidence by the trial examiner moved that the complaint be amended to conform to the proof offered to support its case. That motion was granted by the trial examiner.

Thereafter, the trial examiner made findings of fact and conclusions of law of effect that respondent was guilty of the charge and recommended, as did the Cen-

tral Committee and Executive Council of the Bar Association, in turn, respectively, that respondent be disbarred from the practice of law in this State.

Respondent, a man of family and 57 years of age, has been a member of the Bar of Oklahoma since about January, 1936, and a Certified Public Accountant since about May, 1931. Prior to February 9, 1953, respondent was contacted by employees of Selected with reference to helping Selected extricate itself from tax difficulties in which it found itself involved with the U. S. Government. He had several conversations with some of Selected's officials including its president, Mr. Carroll, and on or about the latter date agreed to assist Selected in the named respect.

Altogether there were some 35 or 40 separate companies, corporations and entities of the Selected group. It took quite a lot of questioning, discussion and study of trust instruments, articles of incorporation, by-laws et cetera for respondent to become fully advised as to the inner-workings and inter-workings of the various involved entities. Then a lot of computing of income, amounts of expenses and deductions and amounts of taxes owing to the Federal Government by the respective entities for the respective years from 1950 through 1956, both inclusive, was required.

Respondent emphasizes that he was not able, at an early stage of their conferences, to quote Mr. Carroll a figure as to what he thought would be a reasonable amount to expect by way of a total attorney's fee for work expected of him in connection with settling the Government's tax claim against Selected.

One of the basic factual points of contention between the parties to this case is whether the purported letter-agreement of October 29, 1954, signed by respondent for himself and Mr. Carroll for Selected, was actually signed by those two men at or about or within any reasonable time next after its date as respondent contends,

or whether it was signed by them, at some later time, as when the bankruptcy proceeding was either filed or impending.

Basically, it is the contention of complainant that respondent had no such letter in his file and in fact that same did not exist at any time prior to the filing of the receivership or bankruptcy proceedings but that such letter was in fact uttered by respondent and Mr. Carroll between the latter time and May 21, 1958, when same was incorporated by respondent in his amendment to claim in the bankruptcy court by reference thereto.

Mr. Smith, for complainant, at the commencement of the Bar trial, made a complete opening statement, a small portion of which is quoted at this point:

"* * * This is the sole charge being made by the Bar Association, that these instruments were false, fraudulent, and misleading. Specifically, a letter which was introduced in evidence and which was attached to the rider of these pleadings. * * *"

Mr. Smith admitted that respondent worked for Selected Investments he assumed under some sort of agreement and said he did not deny respondent spent a great deal of time in his employment on behalf of this client; said he made no contention as to whether a contingent fee as claimed in the Federal Court for ten per cent of several million dollars would be reasonable or not and further said, "The sole issue before the Court is whether the instrument filed by the Respondent was a false and fraudulent instrument, calculated to mislead the Court."

The immediate problem here, as hinted at by the foregoing recitation, stems from the fact that respondent filed in the Federal Court bankruptcy case his original sworn claim for a reasonable fee of ten per cent (10%) of taxes and interest saved to Selected, based upon an alleged oral agreement for which he had no manner of security or note or other evidence whatsoever, and that some two months later (or May 21, 1958), he filed a sworn amend-

ment to such claim, based upon a letter he had meanwhile "found" in his files which was dated and he claimed was written and signed by Mr. Carroll and himself some 3½ years earlier and on or about or soon after October 29, 1954, which he had had somewhere in his files all the time, and about which he had forgotten but then later remembered.

The engraved letterhead upon which that letter was typewritten, together with the date of such letter, constitutes the center of interest of the parties and the factual crux of this lawsuit.

Respondent stoutly defends the authenticity of the letter and the existence of both the letterhead and such letter upon the purported date of the letter or within a relatively short time thereafter.

Mr. O'Bryan testified that he discussed the matter of fee arrangements with no one of Selected's officials or employees except Mr. Carroll. He said Mr. Neal, the Trustee of Selected (as distinguished from the Trustee in Bankruptcy), knew that Mr. O'Bryan was working on the tax case and what was involved in it but that the fee arrangement was never discussed when anyone else than Mr. Carroll was present.

Mr. O'Bryan testified of effect that at about the time (October 20, 1954) he filed the memorandum brief to which reference has been made hereinafter, with the U. S. Government tax authorities, he reached an agreement with Mr. Carroll on his fee which was written up in the form of the "letter dated October 29, 1954, on the stationery of O'Bryan & O'Bryan, which sets this forth, and is signed by Mr. Carroll and myself." Later in his deposition testimony Mr. O'Bryan stated, "I came back to my office, wrote up the memorandum, sent it over there to him, it was signed and sent back to me."

In the Federal Court hearing, the Judge inquired of Mr. O'Bryan and the following proceedings were had:

"* * * THE COURT: You never entered into any other contract about Federal taxes?

"THE WITNESS: No.

"Q: (By Mr. Loving.) Mr. O'Bryan, in this memorandum of March 10, you state that your contract was oral, and about two months later you file this amended claim and attach to it a copy of this alleged agreement.

* * * * * *

"Q: Was that letter in existence on the date that you filed that claim?

"A: It certainly was.

* * * * * *

"A: I filed my claim later on because I could not find those agreements.

* * * * * *

"A: (Interrupting.) I originally had an oral argument.

"Q: You made no mention of having a written agreement anywhere in this letter.

"A: Well, now I would have to read the letter to answer that."

In the same hearing, Mr. O'Bryan testified as follows:

"The question of settlement of the fee in this matter was being negotiated with Mr. Carroll shortly after the rendition of the final Revenue Agent's report on November the 18th, 1957, * * * Now, before we could get a settlement of our fee worked out with Mr. Carroll, the receivership proceedings happened, and then the bankruptcy proceedings, and so that is the way it stands at this time. * * *"

Only four months and some twenty days prior to the filing of his said original claim (Nov. 4, 1957), respondent had written a memorandum to Mr. Carroll, Selected's President, suggesting that he believed he had saved Selected $5,000,000.00 in Federal income taxes and thought he should perhaps receive a fee of 5% thereof, ($250,000.00).

In that hearing, the attorney for the Trustee in Bankruptcy elicited on cross-examination that respondent on November 4, 1957, in a memorandum to Mr. Carroll, to which reference has hereinabove been

made, suggested that a fee to himself of 5% of $5,000,000.00 Federal income taxes saved would not be unreasonable.

Respondent explains that when he made that suggestion he had in mind the possibility of continuing to do tax and legal work for Selected and thereby obtaining continuing employment for his force of some fifteen employees over a period of some ten more years.

On a preceding page hereof has been copied the purported letter-agreement of October 29, 1954, between respondent and Mr. Carroll supposedly on behalf of Selected. It is to be noted that the letterhead upon which same was typed reads in part, "Law Office of O'Bryan and O'Bryan and in the upper left corner appear three names, towit: W. H. Pat O'Bryan, W. Howard O'Bryan, Jr., and Donald L. O'Bryan.

Mr. O'Bryan now says that the agreement for him to receive 10% of tax savings as a fee was reached when the purported October 29, 1954, letter was written. He testified as follows:

"Now, prior to this time, I had requested or suggested a fee of 15 percent as against a retainer of $50,000.00. Mr. Carroll would not agree to that. He thought it was a little bit too much. He did agree to a 10 percent fee. * * *

*  *  *  *  *  *

"Now, I do not know, if the Court please, the exact date that that was reduced to writing. The agreement was reached at the time that we filed our first brief, that is Exhibit 35, and I made penciled notes of it, but we were in the—we—well, we were awfully busy and as will frequently happen in any case, you lay it back for something you are going to do later on. But, nevertheless, that contract was dated the date that we reached our agreement, and that does set out what my agreement with Mr. Carroll was."

Respondent argues that lawyers and business people come to agreements and reduce them to writing later and often date their instruments back to time of original agreement. This is quite true.

But Mr. O'Bryan testified repeatedly of effect that the investigation of the terms of the corporation and trust and the innerworkings and inter-workings of the some 35 or 40 separate entities involved and the investigation of the attitude of the government people involved together with the planning and presentation of defenses to the Government's tax claims all were so complicated as to make it impossible to estimate even within the neighborhood of what his services would be reasonably worth until a later date.

The commissioner ruled on July 3, 1957, to waive income tax claims against the trust, and by October, 1957, had waived examination or approved the tax reports of the other Selected entities and subsidiaries, for 1956 and prior years but indicated the trust would be taxed for 1957 and thereafter on its income although it might have paid such income to its investors. (Mr. Carroll considered revising the trust and the investigations and involuntary bankruptcy proceedings ensued). It is here noted that the "finding" of the purported letter-agreement of October 29, 1954, occurred some eight or more months after the rendition of the above ruling (and some three or four months after the public announcement of its terms).

Mr. O'Bryan, Sr., practiced law in his own name alone prior to admission of his older son to the practice and to the firm. On March 24, 1953, such son was admitted. The younger son was admitted to the practice of law and to the firm on July 19, 1955. Mr. O'Bryan stated that such younger son had worked in Mr. O'Bryan's office since that son was in high school, part of the time, at least, as a senior law clerk.

In the Federal Court hearing the respondent testified that nobody had ever said that the younger son was a member of the firm (prior to his admission to practice); that, if he remembered correctly, later on Don (the younger son) was a

senior law student; that they thought he was going to finish up some classes and in five or six months would be admitted; that respondent naturally wanted his sons' names on there with his and put Don's name there; that after Don was admitted to practice law, his name was added to the firm name and it became "O'Bryan, O'Bryan and O'Bryan"; that if in this interim they had any stationery, whatever it was, they used it up; that he had endeavored to find out and as he understood, Donald's name was put on this letterhead in 1954, in January.

He said this was in anticipation of Don's graduation. In other testimony he said Don had a mixup on class schedules because of being employed and did not graduate until 1955.

Respondent testified further that he ordered some "O'Bryan and O'Bryan" stationery after his older son Howard's admission, and he assumed still other "O'Bryan and O'Bryan" stationery when they ran out with Donald's name on it; that he recognized "O'Bryan and O'Bryan" stationery shown him by counsel with letters apparently written thereon respectively on October 29, 1954, and November 3, 1954, and that Donald's name did not appear on either of such two latter letterheads. He further stated he bought all his stationery through Mike Bryan.

Respondent said he did not know but could learn from a lady employee of Mike Bryan when the changes were made. A joint-owner of the firm which did the engraving work for Mike Bryan Office Supplies testified from his records that his firm engraved the first die for O'Bryan and O'Bryan on January 25, 1954, changed the die on September 15, 1955 and on October 5, 1956, engraved the die for O'Bryan, O'Bryan and O'Bryan.

In the Bar trial before Mr. Rheam, Mrs. Stephens, part owner of the stationery house which was said to have supplied respondent with all his stationery, testified of effect she had been friends with Mr. O'Bryan for several years, was in his office every Monday for 2 or 3 years to get orders, would order out small orders and bill him, but had to get his approval on large orders; that from the dates and amounts of invoices, appearance of stationery samples, etc., it would appear the "O'Bryan and O'Bryan" stationery with the names of the three O'Bryans in upper left-hand corner was ordered in September, 1955; that the purchase orders had long since been destroyed and without those she could not say positively.

She said the W. H. Pat O'Bryan letter of October 29, 1954, addressed to Mr. Hugh A. Carroll, to which reference has been made repeatedly herein, was exactly the same paper as the sample of O'Bryan and O'Bryan letterhead with the names of the three O'Bryans in the upper left-hand corner which she had testified previously was engraved pursuant to the "work order dated September 7, 1955," Western Bond, twenty-pound, and added "It has exactly the same copy here, and it has exactly the same copy here and here as it does on here." She testified the two exhibits were the same type of paper and that she had no record any place she could find that a first run of paper comparable to the September 7, 1955, run sample, had ever been produced before that time. Similarly, Mrs. Stephens testified that to her knowledge the O'Bryan, O'Bryan and O'Bryan stationery was not reproduced before the date indicated, September 25, 1956. She stated, "No sir, there is no doubt about that , so far as I can see, I'm sure that this must be it, because there would be no new die required to produce this job unless the old die was lost and it wasn't lost."

A motion seeking a new trial on the grounds of newly discovered evidence was filed. Attached thereto were two affidavits, one made by the witness, Mrs. Louise Stephens. In her such affidavit Mrs. Stephens stated that she had read a statement in the Findings of Fact and Conclusions of Law in this matter to effect that she had testified "that the particular stationery of O'Bryan and O'Bryan upon which the pur-

ported letter contract was written, was not in existence until September 15, 1955."

She avers "I positively did not make that statement."

Counsel makes further point that, in that affidavit seeking to bolster request for new trial, Mrs. Stephens states that she could not know positively when certain stationery orders were made up without the purchase orders, which had been destroyed; that 20 or 25 people handle the copy inside the job tickets (envelope); that it is fairly simple to get the contents of the envelopes mixed up, it often happens; that she didn't check the records the F. B. I. borrowed before they took them; that the paper on which the letter-contract herein involved was typed was a brand of paper sold by 31 major houses scattered over the west and midwest; that when she had testified that she found no record that the O'Bryan and O'Bryan letterhead with the three names at upper left-hand side had ever been produced until September, 1955, she meant, only, that there was no record; that any record they might have had had long since been destroyed; that from examination of the letterheads and transparencies thereof she now says there are two different dies someplace on O'Bryan and O'Bryan; that that means that they could have at some earlier date than September 15, 1955, made another die and lost their records, or some other engraver could have done so; that $7.50 is far too much for merely adding a name since only $15.20 was charged for a completely new die; that, having seen the two transparencies, she now knows there is another die and another order of letterheads with O'Bryan and O'Bryan at the top; that they could have produced the letterheads and lost the record or that they could have been ordered from out of town, because the price was less than those produced here; that she recalled Howard O'Bryan ordered some stationery from out of town and apologized for it.

Mr. Caporal, an attorney, testified he visited the O'Bryan offices before Donald had passed the Bar examination; saw a new letterhead Howard showed him; noticed it had O'Bryan and O'Bryan at the top and Donald's name with respondent's and Howard's at upper left as did the letterhead on which the October 29, 1954, letter was typed.

In the hearing before the trial examiner it was stipulated that Mr. O'Bryan was employed by Selected Investments; that it was not contended that $1,000,000.00 would not be a reasonable fee for his services. Mr. Washington testified respondent performed services. A vice-president and an auditor of Selected had been told by respondent in June, 1956, and the summer or fall of 1955, respectively, that he had to win the case to get paid a fee.

Mr. Carroll testified that he hired Mr. O'Bryan early in 1953; that respondent told him it would take some time to become acquainted with the organizational structure of Selected and determine what a reasonable fee would be; that in October, 1954, respondent submitted a brief and they then agreed orally to "a fee of ten percent of the savings that might be attained; that that was subsequently reduced to writing; that the purported letter-agreement of October 29, 1954, was the agreement they signed; that it was signed on its date or it could have been early in 1955 or somewhere in there; that the Government had allowed all their deductions which they had taken in the years gone by but beginning January 1, 1957, all the earnings of the trust fund would be taxed as an association at regular corporate rates, 52 per cent; that an audit had been started; that he was pleased with Mr. O'Bryan's services; that under Securities Exchange Commission rules he would have had to have an auditor who was a C. P. A.; that he wanted one who was an attorney; that after getting a copy of the ruling of the Commissioner of Internal Revenue at the time, sometime similar to this letter" (the conference memorandum of November 4, 1957, wherein Mr. O'Bryan suggested a fee of 5% of $5,000,-000.00 and continuous long-time employment) he talked with Mr. O'Bryan trying

to settle the fee; that the state receivership case occurred before they got the fee matters settled.

Mr. Carroll stated that he didn't know whether any other Selected officers knew of the purported October 29, 1954, agreement; that quite frequently he would enter into agreements involving many hundreds of thousands of dollars by simply signing a memorandum agreement not attested by the Secretary of the Corporation and without submitting same to his Board of Directors; that he did the same with Capital Gate; that he knew very substantial sums would be involved in the O'Bryan agreement, particularly if the Government went after income taxes from the beginning of his company; that his attorneys raised no questions because his wife and he "owned 86% of it;" that Mr. Carroll and Mr. O'-Bryan had a conference at which Mr. Carroll called Mr. O'Bryan's attention to there being no reference to a written contract in the November 4, 1957, memorandum (proposing 5% fee of $5,000,000.00) and "that we did have that written agreement calling for the ten per cent. He said, 'well yes, I know that but what I am trying to do now, is to work out a basis whereby we can have a lesser fee and then have a continuous income over a good many years after the new set-up is brought about.'"

Mr. Rader testified Mr. O'Bryan, who had done his income tax returns since 1933, told him 4 or 5 years previous to March, 1959, that he had a contract with Selected Investments for a contingent fee of 10% of whatever he saved the corporation, "up to a million (dollars) maybe."

Mr. Myers, an Oklahoma City attorney, testified Howard O'Bryan, Jr., in late 1954 or early 1955, told him his father had a contingent fee contract with Selected that would run into hundreds of thousands of dollars; that he had a contract and couldn't fail to get his fee.

Mr. Lewis, an attorney, testified by deposition quite at length of general effect that he lived in New Mexico but had lived and practiced law in Oklahoma and had known Mr. O'Bryan 15 or 20 years; that his reputation was good; that he was the best qualified tax lawyer he knew anywhere; that respondent had told him two or four years before February, 1959, that he had saved a client not named $4,000,000.00 and that the witness advised respondent a reasonable attorney fee would be 10% of such saving.

Mr. Howard O'Bryan, Jr., testified that he believed the type of letterhead upon which the purported letter-contract of October 29, 1954, was typewritten was in existence prior to Donald's being admitted to practice law; that he definitely recalled seeing some of that stationery in the spring of 1955 when Caporal came to the office; that Mr. Caporal and he joked about Donald not then being a member of the Bar; that he did not recall that testimony at the time of the Federal Court hearing; * * * that witness observed the exhibit; it was the contract that was made; * * * that the stationery he saw on the named occasion could have had O'Bryan, O'Bryan and O'Bryan, at the top; that "Donald's name was listed there on the side;" that he felt he just didn't know whether this particular stationery, Complainant's C-23, was in existence in October of 1954, or not; that there was a great deal of excitement around the office when they won the Federal tax case "because of the fact and anticipation of receiving a very large fee;" that he was sure he had seen complainant's C-23 "and to just actually state a date that I saw it, I just can't say. I just know that it was there and I believe I know that I must have seen it, but I cannot give you an exact date that I did see it;" that he had discussed it with Mr. William S. Myers and with Mr. Thomas Bamberger; that he remembered a discussion with his father of the fact that they were hopeful to win the case, and when they won it they would have this ten percent (10%) coming; that witness did not "recall ever of discussing that letter. * * *"

Such witness testified he signed three letters which were previously admitted as

exhibits being letters to an Oklahoma City attorney dated June 8, 1955, August 31, 1955, and September 2, 1955, respectively, and typewritten on stationery bearing the heading of O'Bryan and O'Bryan, and having only the names of W. H. Pat O'Bryan and Howard O'Bryan, Jr., in the upper lefthand corner.

Mr. O'Bryan, the respondent, testified before the trial examiner that the F.B.I. was given the run of his files; that he permitted the attorney for the trustee in bankruptcy the free run of his office "any time they wanted to;" that he gave them specimens of writing of all his typewriters "from 1952 and 1953 on up to date; that he didn't know how possession of his proposed conference memorandum of November 4, 1957, was obtained; that it could have been in the Selected Investment files, but that to the best of his recollection it ought to have been in his files; that his purported 10% contract was in his administrative file but that it had "been kinda misplaced;" that the occasion for finding it was that he knew he had an agreement and knew he had to search for it "and just ran across it;" that it was misfiled; that immediately thereafter he filed his amended claim; that he made three or four computations and filed the claim for the maximum amount; that the Special Master in the bankruptcy case told him to "just set it up like you would in a damage suit;" that he did not suppose he had ever filed a damage suit in his life; that he did not remember ever filing a claim in bankruptcy; that he did not even remember ever "making a motion docket;" that he confined his work to his tax specialty; that his work was "confined almost entirely to civil matters or to our office work, appearance before governmental bodies and things of that kind;" * * * that he won the Federal tax case the hard way and was entitled to a fee of at least $500,000.00; that he had saved Selected from $7,000,000.00 to $11,000,000.00; that he was sure that the stationery such as that upon which the October 29, 1954, purported contract was typewritten

was in use in the office in 1955; that the November 4, 1957, conference memorandum was a blown up piece of paper which he was going to deliver to Mr. Carroll for the purpose of letting him talk to the auditors; that if he had come out at that time with, "you owe us a million dollars" he would have "scared everybody off and there would really have been trouble; that the entire purpose of this thing as such was to let Mr. Carroll have to send around his stockholders."

Mr. O'Bryan testified that he did not perfect an appeal from denial of his claim in Federal Court and that he had repaid Selected the $5,000.00 that he had received after January 1, 1958, with which he was surcharged by such Court. He stated that after deducting the amount of advances he had received, he estimated he was "in the hole approximately ninety six thousand dollars ($96,000.00), plus five years work."

Mr. O'Bryan made a statement indicating a belief on his part that the trial judge in Federal Court was prejudiced against him and that he was told before decision was rendered in that court that he didn't have a chance. He further said he "was informed that they wanted five thousand dollars ($5000.00) of the ten thousand dollars ($10,000.00) that was paid to me on the State case on the theory that that was paid in contemplation of bankruptcy. Well, I didn't like that very well and what the alternative was, the alternative was that if I did not accept this proposition, Judge Chandler was going to hand down a judgment for ($59,000.00) fifty-nine thousand dollars against me and my two sons. It was also told to me by my attorney that the Judge was going to see to it that disbarment proceedings were instituted against me and my two sons; and further, for the matter to be referred to the District Attorney's office for criminal charges to be brought against me and my two sons."

Respondent stated he got the $5,000.00 and refunded same and that he abandoned an appeal because of financial stress.

Respondent further said, "I haven't done one cotton-picking thing that's wrong and that's the way I'm willing to let my case rest."

In Oklahoma, an attorney, upon his admission to the Bar, takes an oath that he will act in the office of attorney in this court according to his best learning and discretion with all good fidelity as well to the court as to his client. 5 O.S.1961 § 2. State ex rel. Oklahoma Bar Ass'n v. Ferguson, Okl., 356 P.2d 734.

This Court has exclusive power to prescribe rules for conduct of and to discipline attorneys and to revoke permits to practice law. 5 O.S.1961 § 13. State ex rel. Oklahoma Bar Ass'n v. Ferguson, supra.

This Court by rule has adopted the code of ethics of the American Bar Association as the standard of professional conduct of attorneys at law and further by rule has ordered that "all members of the Association shall be governed thereby;" and that "An attorney violating any of such canons shall be subject to discipline or disbarment, * * *." Article 10 of The Revised Rules Creating, Controlling and Regulating the Oklahoma Bar Association, 5 O.S.1961, Chap. 1, App. 1, State ex rel. Oklahoma Bar Ass'n v. Ferguson, supra.

· Canon 22 of such Canons of Professional Ethics states, in pertinent part, that, "The conduct of the lawyer before the Court and with other lawyers should be characterized by candor and fairness. * * *" and that "It is unprofessional and dishonorable to deal other than candidly with the facts * * * in drawing affidavits and other documents, and in the presentation of causes. * * *"

Canon 29 thereof, in pertinent part, states that "The lawyer * * * should strive at all times to uphold the honor and to maintain the dignity of the profession and to improve not only the law but the administration of justice." ·

Respondent, in effort to dissuade this Court from following the recommendation that he be disbarred, asserts two propositions of error. The first is that the findings of fact and conclusions of law are not supported by the evidence.

It is argued that a "false claim" is one for more compensation than that to which the claimant is entitled, or a statement or claim which is not true, but that a mere mistake, made through error or inadvertence, is not within the intendment of the expression; that an attorney is presumed to be innocent of a charge upon which his disbarment is sought, and to have performed his duty as an officer of the Court in accordance with his oath; that the Court, to be warranted in adjudging disbarment, must be satisfied from the evidence to a reasonable certainty that the charges are true; that his guilt must be clearly proven and that more than a preponderance of the evidence is required. (Authorities are cited for these statements.)

Respondent argues that he had earned a fee of half a million to a million dollars; that there was but a scintilla, at most, of evidence tending to show that the letter-head in question was not in existence prior to 1955. He discusses the effect of the testimony. He contends that he had no full opportunity, with preparation, to cross-examine Mr. Nichols in the Federal Court hearings and adds, "* * * nor was he prepared to call witnesses to refute the inferences made by Harry E. Nichols, Jr." Respondent makes point of the fact that he never did testify that the purported letter-contract was executed exactly on its date; that the Federal Judge indicated, according to portion of the record quoted, that it was his idea "that this contract wasn't written when it is purported to have been written. * * * Now, if that is true, that is all there is to this lawsuit, if he can prove it. The fraud would vitiate the whole transaction." Respondent says such is not the law (citing authority).

Thereupon counsel launches into a forty-page discussion of the evidence in the case. He argues that the November 4, 1957,

memorandum was an instrument gotten up by Mr. O'Bryan for Mr. Carroll to use in dealing with auditors and stockholders in the impending reorganization of Selected, but never delivered to Mr. Carroll; that Mr. Carroll and Mr. O'Bryan both knew Mr. O'Bryan had a written contract for a 10% fee but that the idea was that Mr. O'Bryan would collect only $250,000.00 or so at the time, would have to pay income taxes only upon that amount at that time, and would receive a sort of retainer for some 10 years and pay income taxes thereon in a much lower bracket, and that Mr. Carroll's companies would have the use of the difference in amounts of money for several years and could use it to make more money. A summary of the evidence of other witnesses was given and counsel concluded that "it is impossible to see how the prosecution has sustained the burden of proving respondent's guilt by 'more than a preponderance of the evidence' when he, at all times, is presumed to be innocent."

Our statutes, under the subject of Contracts, 15 O.S.1961 §§ 57, 58 and 60, deal with the subject of fraud. Section 57 states that "Fraud is either actual or constructive," Section 58 defines actual fraud, and Section 60 provides that "Actual fraud is always a question of fact."

In this case it appears that respondent in November, 1957, thought he had an oral contract. He still thought so in early March, 1958, and on the 24th day of that month. But by May 21, 1958, he had a purported written one. The original and amended sworn claims filed in the bankruptcy case appear to be contradictory of each other. Explanation thereof sought to be made seems insubstantial.

The evidence appears to show that the letterhead upon which the October 29, 1954, purported letter-contract attached to amended claim as exhibit was not in existence at least until 1955, probably in September.

In the case of McAtee v. Garred, 185 Okl. 314, 91 P.2d 1095, 1098, this Court said:

"It has also been held that the gist of fraudulent misrepresentation is the producing of a false impression, and the means of accomplishing it are immaterial. Wilson v. Rentie, 124 Okl. 37, 254 P. 64. Also see Operators Royalty & Producing Co. v. Greene, 173 Okl. 388, 49 P.2d 499."

In 37 C.J.S. Fraud § 61c, p. 350 it is stated:

"It is not essential to liability that the person charged with fraud should have received any benefit therefrom * * *."

In 23 Am.Jur. Fraud and Deceit § 26, p. 779, it is said:

"Fraud will vitiate any contract procured thereby. * * *"

In Griffith v. Scott, 128 Okl. 125, 261 P. 371, 376, citing R.C.L., this Court said:

" 'Fraud may be proved by circumstantial evidence. Indeed, from its nature it is difficult to prove it by direct evidence, and it is seldom that it can be so proved. Hence it is more often shown by circumstances than in any other way. It is impossible, however, to enumerate the facts from which it may be inferred. Each case must depend on its own facts, and all the facts and circumstances connected with and surrounding the transaction are to be considered together in determining whether it was fraudulent. Facts of trifling importance when considered separately, or slight circumstances trivial and inconclusive in themselves, may afford clear evidence of fraud when considered in connection with each other. It has been said that in most cases fraud can be made out only by a concatenation of circumstances, many of which in themselves amount to very

890

little, but in connection with others make a strong case.'

"Many cases, both state and federal, are cited in support of the different phases of the text."

In 24 Am.Jur. Fraud and Deceit, § 281, p. 127, it is said:

" * * * the general rule is that it is not essential to the sufficiency of circumstantial evidence as proof of fraud that the facts be such that they are not explicable on any other reasonable hypothesis than that of fraud. Circumstantial evidence of fraud need not be conclusive or so strong as to dispel any and every doubt as to the existence of fraud, even though the fraud alleged constitutes a criminal offense, but is sufficient if it satisfies the mind and conscience that a fraud has been committed as alleged or if it fairly tends to prove fraud and produces a clear and rational belief of its existence."

In the case of Wingate et al. v. Render, 58 Okl. 656, 160 P. 614, 617, this Court stated,

" * * * [t]he evidence tending to show fraud on the part of the plaintiffs in padding the books of the company and the statement of their assets made for the information of the defendant is very voluminous and covers a wide range."

* * *

"A wide latitude is allowed in cases of fraud, and circumstances altogether inconclusive, if separately considered, may, by their number and joint operation, especially when corroborated by moral coincidences, be sufficient to constitute conclusive proof."

As asked by counsel for complainant in brief, "May an attorney working under an oral agreement of employment reduce said agreement to writing in order to strengthen his claim for fees and submit the same to the Court as though it had been in existence prior to the dispute or controversy in connection with the attorney fees?" We believe that is what occurred here, but that same may not properly be done.

We conclude that the evidence in this case is sufficient to overcome the presumption that respondent is innocent and to establish to a reasonable certainty that the charge against him is true.

In his second proposition it is contended on behalf of respondent that he "has been denied due process of law and equal protection of the law as guaranteed by Art. 1, Sec. 1; Art. 2, Sec. 2; Art. 2, Sec. 7, of the Constitution of the State of Oklahoma and the 14th Amendment to the Constitution of the United States."

By the respective sections of the Constitution of Oklahoma to which reference has been made by counsel, it is provided that "The State of Oklahoma is an inseparable part of the Federal Union, and the Constitution of the United States is the supreme law of the land;" that "All persons have the inherent right to life, liberty, the pursuit of happiness, and the enjoyment of the gains of their own industry;" and that "No person shall be deprived of life, liberty, or property, without due process of Law."

By the Fourteenth Amendment to the Constitution of the United States it is provided, in pertinent part, that no State shall "deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

In sub-paragraph (a) of respondent's second proposition, he asserts that "The Supreme Court exceeded its authority in delegating its judicial powers to the Oklahoma Bar Association." He argues that this Court, in creating the Bar Association by order, has said it has inherent power so to do; and that such "power is not subject to delegation to committees and representatives." (Citing In re Integration of State Bar of Oklahoma, infra). He defines a private corporation as being one which does not possess governmental powers or func-

tions and states that by its revised rules this Court has made the Bar Association a private corporation and sought to bestow upon it a measure of its own inherent power to disbar.

Respondent quotes from In re Integration of State Bar of Oklahoma, infra, wherein is set forth the procedure for filing a complaint and getting a hearing thereon, and "urges that the present Bar rules are unconstitutional in that the Supreme Court has attempted to delegate to the O.B.A. its non-delegable authority—hence, this entire proceeding is a nullity."

In such case of In re Integration of the State Bar of Oklahoma, 185 Okl. 505, 95 P.2d 113, 115, this Court quoted from the case of In re Integration of Nebraska State Bar Association, 133 Neb. 283, 275 N.W. 265, 267, 114 A.L.R. 151, as follows:

"'The inherent power of this court which petitioners ask us to invoke has always existed. This power is not subject to delegation to committees and representatives, although these agencies may be utilized for investigation or fact-finding purposes and to make recommendations, but the final decision must rest with the court.'"

In the present case, this Court has merely been afforded the services of certain members and officials of the Oklahoma Bar Association in presenting respondent's case to the trial examiner and in turn to the Court. The ultimate responsibility rests with the Court. We find no merit in respondent's argument that the Court has exceeded its authority in the respects asserted for the reason none of its judicial powers have been delegated to the Bar Association. This Court itself has the final say in matters of the present sort.

As his sub-proposition (b) of such second proposition, respondent asserts that

"The Bar rules did not afford the respondent due process of law in that the respondent was indicted by the Central Committee of the Oklahoma Bar Association, tried with a member of the Central Committee appearing as Judge, with the aforesaid trial examiner appearing as an advocate for conviction before the Executive Council thereby causing the Executive Council to 'rubber stamp' the trial examiner's Finding of Facts and Conclusions of Law; said Executive Council having met secretly, tried this respondent in absentia, and denied this respondent a hearing upon application for said hearing".

Respondent quotes portions of the rules concerning disciplinary proceedings (Art. VII (a) and (b)) including the following:

"(a) The Executive Council may investigate misconduct by members of the Bar of this State. * * *"

"(b) The Central Committee shall have the same authority as the Executive Council in disciplinary matters and wherever herein action by the Executive Council is specified, the action may be by the Central Committee."

Respondent cites authority for the point that "the deprivation of any rights, civil or political, previously enjoyed, may be punishment * * *."

He argues of effect that Mr. Rheam and one other member of the Central Committee could have constituted a majority of a quorum of three; that any two of that Committee could decide "to prosecute any member of the Bar, appoint one of the proponents for indictment as the Trial Examiner, rehash the case again at some secret meeting (which is supposed to be a hearing before the Executive Council), make no minutes or transcript concerning the indictment nor the hearing before the Executive Council, and file the same of public record in the Supreme Court."

Objection is made that no formal complaint was filed; that the "indictment" could have been returned by as few as two Central Committee Members, including Mr. Rheam who "tried him" and "actually indicted him"; that Mr. Rheam appeared before the Executive Council (which could have operated with as many as fifteen or as few as three persons present); that such

Executive Council denied respondent's request for oral argument and adopted Mr. Rheam's findings and conclusions. The inference is that such Council then reported its action to the newspapers but gave respondent no copy of Mr. Rheam's report. Respondent emphasizes that he brought an original action in this Court seeking a writ requiring the Executive Council to grant him oral argument, and which we denied. Respondent quotes a rule of effect that respondent or his attorney were entitled to be furnished a copy of the report.

With respect to this line of objections and argument it is to be remembered that upon direction by the Executive Council, a complaint was filed by the then President of the Bar Association; that pursuant to authority granted it by the rules, the Executive Council selected Mr. Rheam as Trial Examiner and Mr. Smith as the Association's counsel; that respondent requested and was granted a public hearing; that his request for oral argument was, as reported by the Bar, considered before denial; and, that it is this Court which passes finally upon the record which respondent helped make.

Nothing in the rules required that respondent be granted oral argument in the earlier stages of the proceedings. He requested and was granted oral argument in this Court. From the news article quoted by counsel in brief it would appear that several of the statements therein apparently contained were attributed to respondent, but that it was therein stated that the trial examiner's report had not been filed, and that no official of the Bar would comment.

The Bar reported to this Court that before consideration of the report of Mr. Rheam on August 13, 1959, by the Central Committee and on October 15, 1959, by the Executive Committee, copy of the report, findings and recommendation was furnished to respondent. Under our criminal procedure a formal indictment must be returned by a grand jury (22 O.S.1961 § 381). However, a formal information may be filed by one county attorney (22 O.S.1961 § 409)

and a defendant in a criminal (even a capital) case may be held for trial upon the order of one magistrate. (22 O.S.1961 § 264).

Counsel compares the proceedings herein to those in a military tribunal and decries that no investigation was made preliminary to institution of the proceeding. Apparently the Bar made an investigation sufficient for its purposes inasmuch as it caused complaint to be filed. Even if respondent had no notice that he was being investigated, he did have notice of setting for trial, was present in person and by counsel and fully participated. That the trial examiner was required to take no oath is emphasized. An attorney upon admission to practice is sworn as an officer of the Court. Mr. Rheam presumably took that oath. And his service in this case was as an officer of the Court.

Counsel says lawyers are entitled to the benefits of the Fifth Amendment to the Constitution of the United States and quotes from an opinion of this Court in Cook v. Parkinson, 191 Okl. 529, 131 P.2d 82, of effect that failure to observe "the forms of law" may amount to a "want of due process of law." Ex parte Autrey, 58 Okl.Cr. 88, 50 P.2d 239, is cited for the statement that Article 2, Section 7, Oklahoma Constitution, guarantees due process of law, the intendment of which is "to protect the citizen against arbitrary action, and to secure to all persons equal and impartial justice." Our attention is directed to the fact that the trial examiner upon occasion questioned respondent at length.

Counsel cites Ex parte A. H. Garland, 4 Wall. 333, 18 L.Ed. 366, 370, of effect that the right of an attorney to practice law is one of which he may be deprived only by judgment of the court and that for moral or professional delinquency. Konigsberg v. State Bar of California, 353 U.S. 252, 77 S.Ct. 722, 1 L.Ed.2d 810, and Schware v. Board of Bar Examiners of the State of New Mexico, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796, are cited for the principle that an attorney, or a prospective attorney, has

a property right in the practice of law and that a state may not exclude a practitioner in a manner violative of due process or the equal protection clause of the Fourteenth Amendment to the Constitution of the United States. It is urged that the rules to which reference is herein made do not comply with the requirements of due process and equal protection as guaranteed by the National and State Constitutions.

In the 1882 decision of the Supreme Court of the United States in Ex parte Wall, 107 U.S. 265, 273, 279, 288, 289, 290, 2 S.Ct. 569, 575, 581, 589, 590, 27 L.Ed. 552, the Court said, "It is laid down in all the books in which the subject is treated, that a court has power to exercise a summary jurisdiction over its attorneys to compel them to act honestly towards their clients, and to punish them by fine and imprisonment for misconduct and contempts, and, in gross cases of misconduct, to strike their names from the roll. * * *"

\* \* \*

(Quoting from In re Blake, 3 El. & El. 34) "* * * the court will not allow suitors to be exposed to gross fraud and dishonesty at the hands of one of its officers."

\* \* \*

"It is contended, indeed, that a summary proceeding against an attorney to exclude him from the practice of his profession on account of acts for which he may be indicted and tried by a jury, is in violation of the fifth amendment of the constitution, which forbids the depriving of any person of life, liberty, or property without due process of law. But the action of the court in cases within its jurisdiction is due process of law. It is a regular and lawful method of proceeding, practiced from time immemorial. Conceding that an attorney's calling or profession is his property, within the true sense and meaning of the constitution, it is certain that in many cases, at least, he may be excluded from the pursuit of it by the summary action of the court of which

he is an attorney. The extent of the jurisdiction is a subject of fair judicial consideration. That it embraces many cases in which the offense is indictable is established by an overwhelming weight of authority. This being so, the question whether a particular class of cases of misconduct is within its scope, cannot involve any constitutional principle. It is a mistaken idea that due process of law requires a plenary suit and a trial by jury in all cases where property or personal rights are involved. The important right of personal liberty is generally determined by a single judge, on a writ of habeas corpus * * *."

\* \* \*

"The question, what constitutes due process of law within the meaning of the constitution, was much considered in this court in the case of Davidson v. New Orleans, 96 U.S. 97 [24 L.Ed. 616]; and Mr. Justice Miller, speaking for the court, said: 'It is not possible to hold that a party has, without due process of law, been deprived of his property, when, as regards the issues affecting it, he has by the laws of the state a fair trial in a court of justice, according to the modes of proceeding applicable to such a case.'"

No irregularity violative of any of respondent's rights has been discovered by us to have occurred in the handling of the preliminary stages of respondent's case.

Respondent for subhead (c) of his 2nd proposition of error states, "(c) This respondent was not confronted by the witnesses against him; hearsay evidence was introduced over the objection of respondent; hence, respondent was denied the right of cross-examination."

■■■ Objection is made that this proceeding was started by the sending of the Federal Judge's letter to the Bar Association; that such Judge's statements did not come to respondent's attention until the filing in this Court of the trial examiner's report; that discussions between such Judge

and Counsel for the trustee in bankruptcy which occurred in the trial on respondent's claim in Federal Court were included in the transcript of proceedings in that Court which was introduced in the proceedings, before the trial examiner; that neither such Judge nor attorney testified in the Bar proceeding and respondent was denied an opportunity of cross-examining them.

The respondent continues that such trustee's attorney contended Mr. O'Bryan wrote the purported October 29, 1954, letter-contract after March 10, 1958, but that "There is not one iota of evidence in any of the proceedings which substantiates such an assertion." Point is made that that attorney was subpoenaed to testify on behalf of the Bar Association; that respondent had taken his deposition, in which he admitted that he had "pretried" the O'Bryan case with the Judge prior to the Federal Court hearing of November 3, 1958; "yet, the prosecution chose not to use his testimony;" that "It is readily apparent that the prosecution would have used Mr. Loving's testimony had it been to their advantage;" that "the parties, plaintiff and defendant, were not the same" in the Federal Court proceeding as in the Bar proceeding; and "hence, testimony of witnesses in that proceeding should not have been received in this proceeding;" that, "the assertion of the counsel as well as the vituperation of the Judge should not be included herein, especially as there was no chance of cross-examination nor were the statements under oath;" that, interestingly, in the order of the Federal Court denying respondent's claim for fee and directing that he return to the Trustee in Bankruptcy $5,000.00 of the money already received by him, there was "no finding that the respondent committed fraud;" that that Journal Entry of Judgment did not bar "respondent from practice in that Court; * * * hence, there appears to be no binding judgment on either of these issues."

Respondent sums up with the statement that he "has never been charged, in any court of general Jurisdiction, with fraud or other misconduct" (except as inferable from the Bar proceedings and newspaper accounts); that "he has never been presented with a Bill of Particulars or afforded the opportunity to answer and meet such charges or to be confronted with witnesses asserting the same; all of which constitutes denial of due process of law and equal protection of the law as guaranteed by Art. 1, Sec. 1 and Art. 2, Secs. 2 and 7 of the Constitution of the State of Oklahoma and the Fourteenth Amendment to the Constitution of the United States."

In the determination of the merits of this case, this Court has considered only the evidence introduced, the inferences properly deducible therefrom and the law we deem to be applicable to the facts.

In Ex parte Wall, supra, at pages 281, 286 and 287 of 107 U.S., at pages 582, 587 and 588 of 2 S.Ct., the Court said:

"The cases are quite numerous in which attorneys, for malpractice or other misconduct in their official character, and for other acts which showed them to be unfit persons to practice as attorneys, have been struck from the roll upon a summary proceeding without any previous conviction of a criminal charge."

\* \* \*

"In the Matter of Wool, 36 Mich. 299, a bill in equity having been filed against an attorney charging him with procuring a deed to himself by forgery or substitution of a paper, and a decree having been made against him, the court entered an order to show cause why he should not be struck from the roll, allowing him to present affidavits in exculpation; but no sufficient cause being shown against the rule, it was made absolute. Here was an indictable offense, and no previous conviction; yet the court, upon the evidence it had before it, struck the party's name from the roll."

\* \* \*

"\* \* \* Cases may occur in which such a requirement (conviction before

striking name from rolls) would result in allowing persons to practice as attorneys, who ought, on every ground of propriety and respect for the administration of the law, to be excluded from such practice. A criminal prosecution may fail by the absence of a witness, or by reason of a flaw in the indictment or some irregularity in the proceedings; * * * But other causes may operate to shield a gross offender from a conviction of crime, however clear and notorious his guilt may be * * *. It seems to us that the circumstances of the case, and not any iron rule on the subject, must determine whether, and when, it is proper to dispense with a preliminary conviction."

* * *

"The provisions of the constitution which declare that no person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a grand jury, and that the trial of all crimes, except in cases of impeachment, shall be by jury, have no relation to the subject in hand. As held by the supreme court of Tennessee in Fields v. State, (and the same view is expressed in other cases,) the constitutional privilege of trial by jury for crimes does not apply to prevent the courts from punishing its officers for contempt, or from removing them in proper cases. * * * The proceeding is not for the purpose of punishment, but for the purpose of preserving the courts of justice from the official ministration of persons unfit to practice in them. * * * The power to do this is a rightful one; and, when exercised in proper cases, is no violation of any constitutional provision."

■ In the recent case of Travelers Fire Insurance Co., etc., et al., v. Wright, et al., Okl., 322 P.2d 417, 418, 70 A.L.R.2d 1170, this Court held in effect that, in the trial of a suit by plaintiff upon an insurance policy it would have been proper for the lower court to have received in evidence the testimony of witnesses previously introduced in the trial of a criminal charge against him for burning the buildings purportedly covered by the policy. Therein, the Court said:

"2. Testimony given at a former trial is admissible, under the common law, in a subsequent trial if the former testimony was given upon such an issue that the party-opponent in that case had the same interest and motive in his cross-examination that the present opponent has; provided it is necessary to admit such former testimony in order to utilize the knowledge of the witness, and provided the objecting party does not call to the court's attention any peculiar facts or circumstances which would cause the admission of such testimony to be an injustice."

Our attention has been called to an ultimate material facts known to the Federal Judge or Attorney Loving, in the capacity of witnesses, which could not be elicited and were not elicited from other witnesses, except possibly their feeling concerning respondent. And that would not be material to our present consideration. Moreover, counsel in objections, motions, briefs, et cetera has amply covered that matter to the full advantage of respondent.

Further, the proposed witnesses are members of the Bar, amenable to its process. No showing has been made either that they were subpoenaed by respondent for cross-examination or that had they been, they would not have appeared.

We conclude that respondent was afforded due process and equal protection of the law.

■ For the last sub-division of his second proposition of error, respondent states he "was denied the right of jury trial."

Respondent refers us to Oklahoma Constitution, Article 2, Sections 19 and 20. Such section 19 provides that "The right of trial by jury shall be and remain inviolate, * *." Such Section 20 of that Article lists certain rights of the accused in a criminal case.

Respondent mentions the motions etc. he has filed herein pointing toward his being

granted a jury trial; states his professional career is of the value of at least $20.00 (in a suit for below which amount a litigant may have less entitlement, under said Section 19, to a jury trial); refers us to the case of Keeter v. State ex rel. Saye, 82 Okl. 89, 198 P. 866, 17 A.L.R. 557, wherein the Court said that "Courts have a duty to enforce strict observance of constitutional and statutory provisions designed to preserve inviolate, right to, and purity of jury trial;" and refers us to 20 O.S.1961 § 9 and § 10 relative to the procedure in this Court in a proper case for selection of a jury. He states this Court has original jurisdiction to try Bar complaints and infers from the foregoing authorities that in trying the complaint against respondent the services of a jury should be employed.

In the case of Ex parte Thompson, 228 Ala. 113, 152 So. 229, 107 A.L.R. 671, 684, the Supreme Court of Alabama, after a study of the question in twenty-nine states, including Oklahoma, said:

"Due consideration of the adjudged cases in the several states of the Union leads us to the conclusion—which is unescapable—that the courts have the inherent power to suspend or to remove attorneys without trial by jury."

As shown in both the portion of Ex parte Wall quoted in discussion of sub-paragraph (b) and that quoted in discussion of sub-paragraph (c), respectively, of respondent's second proposition, the Supreme Court of the United States, for eighty years has been of the view that a lawyer is not entitled to a jury trial in a disbarment proceeding.

According to the Supreme Court of California in In re Wharton, 114 Cal. 367, 46 P. 172, an accused lawyer in a disbarment proceeding under their statute was not entitled to a jury trial.

In Gould v. State of Florida, 99 Fla. 662, 127 So. 309, 69 A.L.R. 699, 701, the Supreme Court of the named State said that as applied to a disbarment proceeding, "a jury trial is not required."

In Oklahoma, the common law, as modified, remains in force in aid of statutory provisions and judicial decisions. 12 O.S. 1961 § 2. This Court has the inherent power to admit lawyers to the practice of their profession and to disbar those whose conduct warrants such action. In such an instance, the accused is not entitled to a jury trial.

In respondent's reply brief three propositions are advanced. It is first stated that complainant abandoned its cause of action in opening statement.

The second proposition in respondent's reply brief is that complainant's summary of the testimony is not supported by evidence. For his last such proposition respondent deals with an exception to the hearsay rule and quotes from Kurn et al. v. Thompson, 187 Okl. 664, 105 P.2d 422 of effect that where it is claimed the testimony of a witness is a recent fabrication, he may be corroborated by showing previous self-serving declarations conforming thereto, if made at a time when a motive to misrepresent did not exist.

We believe all these matters and the arguments submitted in connection therewith to have been fully answered in the foregoing portion of this opinion.

It is also urged in the reply brief that as of the date of filing thereof no criminal indictment had been lodged against respondent. A motion to Stay Ruling was filed herein on August 9, 1962, on behalf of respondent. In that motion respondent referred to the pendency in Federal Court of his motion to dismiss the indictment. Recently, upon invitation by order of this Court, respondent filed a response advising that he had been indicted by a Federal Grand Jury in November, 1961; that he had filed a motion to quash the indictment because a Federal Judge was present in the grand jury room and gave that body certain information concerning Mr. O'Bryan's case; that such motion had on September 28, 1962, been sustained. A copy of transcript of proceedings in the grand jury room was attached. Respondent alleges bias on the part of the Federal Judge and states that two other grand juries have convened

and adjourned and neither has indicted respondent. On May 1, 1963, respondent filed an instrument entitled "Supplemental Information." That also dealt with the validity of the grand jury indictment.

In Mr. O'Bryan's affidavit attached to motion for new trial he stated that he had "permitted the F.B.I. to investigate and examine his records, his personnel, the actual document in question, the typewriter upon which the document in question was typed, stationery, typewriter specimens, and everything of every nature that the F.B.I. considered relevant to its investigation;" that he had learned from a public statement of the Federal Judge that the F.B.I. found nothing wrong with the questioned document, and made no recommendation for the filing of a criminal charge; that if he were granted a new trial he would be able to subpoena witness who would "testify to the results of the F.B.I. investigation, which testimony would be likely, as affiant verily believes, to change the result of a new trial."

For a discussion of the principles involved in such a situation, see the second series of quotations from Ex parte Wall, supra.

In the 1921 Vermont case of In re O'Brien, 95 Vt. 167, 113 A. 527, 14 A.L.R. 859, 866, the Supreme Court of that state dealt with the case of an attorney found to have falsely testified that 4 or 5 years before 1917 he found a paper prepared by an attorney who had died in 1904 and whose office he later occupied, which instrument, if genuine, would affect the outcome of a certain suit. The Court refused to vacate a prior judgment disbarring O'Brien. In that case, the Vermont Court said:

"* * * But where disbarment may be ordered for criminal misconduct without awaiting a conviction thereof an acquittal will not, as of course, prevent the entry of an order to that end. * * * Nor will the refusal of a grand jury to find an indictment for the same criminal misconduct charged in disbarment proceedings be a defense to the latter. * * * And for the same reason the entry of a nolle prosequi in a

criminal prosecution does not constitute a defense to disbarment proceedings based on the commission of the crime."

Several cases in which the facts bear some similarity to the facts in the case at bar have come to our attention.

In the 1891 case of People ex rel. Atty. Gen. v. Beattie, 137 Ill. 553, 27 N.E. 1096, the Supreme Court of Illinois disbarred a Chicago attorney who knowingly drew a false complaint for divorce, introduced false testimony as to plaintiff meeting residence requirements, etc., and prepared and delivered to his client a supposed decree of divorce upon the basis of which she remarried before a decree had in fact been entered. See also the 1958 case of In re King, 7 Utah 2d 258, 322 P.2d 1095. In the case of People ex rel. Chicago Bar Ass'n, v. Martin, 288 Ill. 615, 124 N.E. 340, 14 A.L.R. 854, an attorney was disbarred for having knowingly made a false affidavit concerning his client's defense. See also In re Taylor, 300 Ky. 448, 189 S.W.2d 403, where the court said an attorney was "guilty of deceit and assisting to perpetrate a fraud upon the court" by having sat by while his purported wife sought to prove and dissolve a marriage, which the lawyer later denied ever existed, etc., etc.

See also the case of In re Wright, 69 Nev. 259, 248 P.2d 1080, 1083, wherein the court stated:

"It is clear that subornation of perjury, tampering with witnesses or otherwise practicing deception upon a court by fraudulent devices is gross misconduct in the perverting or obstructing of justice and warrants disbarment."

It makes no difference that a false statement is to be used in another court, even in another state. See annotation in 14 A.L.R. at page 869.

For the foregoing reasons, it is determined that the recommendation of the Oklahoma Bar Association that respondent, William Howard (Pat) O'Bryan, be disbarred from the practice of law in Oklahoma and his name stricken from the roll of attorneys of this state be and the same is approved and

he is hereby disbarred and his name ordered so stricken.

It is the further order of this Court that respondent may apply to the proper officials of the Bar to be reinstated as a member thereof at any time after two years have elapsed from the effective date of this opinion.

BLACKBIRD, C. J., HALLEY, V. C. J., and JACKSON, IRWIN and BERRY, JJ., concur.

JOHNSON, J., dissents.