**STATE of Oklahoma, ex rel. OKLAHOMA BAR ASSOCIATION, Complainant,**

v.

**Donald E. SMOLEN, Respondent.**

**OBAD No. 1029.**
**SCBD No. 3778.**

Supreme Court of Oklahoma.

July 14, 1992.

**ORDER IMPOSING DISCIPLINE**

This matter is before us for imposition of final discipline. Proposed Agreed Stipulations of Fact and Conclusions of Law with Agreed Recommendation for Discipline have been entered into by complainant and respondent. The stipulations and recommendation have been accepted and approved by the Trial Panel of the Professional Responsibility Tribunal (PRT). The parties have filed a joint waiver of briefs and have requested this Court to follow the recommendation of the PRT.

By virtue of a two (2) count complaint and amended complaint respondent was charged with misconduct warranting professional discipline. The stipulations respondent agreed to are substantially as follows:

**AGREED FINDINGS OF FACT AS TO COUNT I**

1. Between June 6, 1989 and December 28, 1990, respondent loaned $79,304.00 to 161 clients.

2. During this same time respondent earned $1,481,000 on gross receipts of $5,778,000, including client's share, and represented more than 1,600 clients.

**AGREED CONCLUSIONS OF LAW AS TO COUNT I**

Respondent's conduct constitutes grounds for professional discipline and violated the mandatory provisions of Rule 1.8(e), Oklahoma Rules of Professional Conduct, 5 O.S.1991, Ch. 1, App. 3–A, to wit:

(e) While representing a client in connection with contemplated or pend

---

ing litigation, a lawyer shall not advance or guarantee financial assistance to a client, except that a lawyer may advance or guarantee the expenses of litigation, including court costs, expenses of investigation, expenses of medical examination, and costs of obtaining and presenting evidence, provided the client remains ultimately liable for such expenses.

## AGREED FINDINGS OF FACT AS TO COUNT II

1. On August 11, 1987, in OBAD # 758, SCBD # 3382, respondent was suspended by this Court for eight (8) months for violating provisions of DR 1–102(A)(3) and (4) and DR 9–102(B), Code of Professional Responsibility, 5 O.S.1981, Ch. 1, App. 3 and Rule 1.3 of the Rules Governing Disciplinary Proceedings, 5 O.S.1981, Ch. 1, App. 1-A.

## AGREED MITIGATION

1. The loans made by respondent were non-interest bearing. Respondent loaned money for humanitarian reasons to clients who were destitute, without other means and resources or credit to obtain loans for sustenance during the pendency of their disability and in many cases could not work because of their injury.

## AGREED RECOMMENDATION FOR DISCIPLINE

As discipline respondent should receive a public censure from the Oklahoma Supreme Court.

Our review of the matter indicates respondent voluntarily of his own free will and knowingly agreed to the proposed stipulations and there is a factual basis therefore. No contention was made by the parties that Rule 1.8(e) is unconstitutional. After independent review of the matter we determine respondent has engaged in professional misconduct warranting discipline and that the recommendation of the PRT should be followed.

IT IS THEREFORE ORDERED that the proposed Agreed Stipulations of Fact and Conclusions of Law with Agreed Recommendation for Discipline, be hereby approved and respondent, Donald E. Smolen, upon publication of this Order Imposing Discipline in the official reporter shall stand publicly censured.

IT IS FURTHER ORDERED respondent pay the costs of this matter in the amount of $281.75 within thirty (30) days from the date this order becomes final as a condition precedent to his continued right to practice law.

OPALA, C.J., HODGES, V.C.J., and LAVENDER, SIMMS and HARGRAVE, JJ., concur.

ALMA WILSON and KAUGER, JJ., concur in part; dissent in part.

SUMMERS, J., dissents.

KAUGER, Justice, concurring in part, dissenting in part:

This Court's duty in disciplinary proceedings is to protect the public and to preserve its confidence in the legal profession and in the judiciary which licenses it. We should tolerate nothing less than the highest degree of integrity and fidelity in the lawyer-client relationship.[1] Disciplinary proceedings are instituted to safeguard the interest of the public, to protect it, and to preserve the public confidence in the legal profession and the entire judicial system, not to punish a legal practitioner.[2] We must zealously promote regulation of the bar without forgetting that lawyers are also entitled to due process during the course of disciplinary proceedings.[3]

1. *State ex rel. Oklahoma Bar Ass'n v. Raskin,* 642 P.2d 262, 267 (Okla.1982).

2. *State ex rel. Oklahoma Bar Ass'n v. Stubblefield,* 766 P.2d 979, 984 (Okla.1988); *State ex rel. Oklahoma Bar Ass'n v. Evans,* 747 P.2d 277, 280, 85 A.L.R.4th 557, 564 (Okla.1987); Annot., "Attorney & Client: Disciplinary Proceeding Based Upon Attorney's Direct or Indirect Purchase of Client's Property," 35 A.L.R.3d 674, 676 (1971).

3. *State ex rel. Oklahoma Bar Ass'n v. Lobaugh,* 781 P.2d 806, 811 (Okla.1988).

*Overreaching for pecuniary gain by an attorney should be vigorously investigated and discipline imposed if warranted.* I would ensure this result by returning to the rules existing before January 1, 1970, which pass constitutional muster.[4] However, the majority opinion imposes a public censure on the respondent, Donald E. Smolen (Smolen/attorney), for providing humanitarian, non-interest bearing loans to destitute clients.[5] Because the only difference between courting clients with receptions and dinner parties and helping a destitute client through a non-interest bearing loan is one of compassion, and because it appears that Rule 1.8(e) of the Oklahoma Rules of Professional Conduct[6] violates both the Oklahoma and the United States

---

4. Rule 10, 5 O.S.1961, Ch. 1, App. 3, see note 6, infra; Rule 42, 5 O.S.1961, Ch. 1, App. 3, see note 6, infra. These rules would not prohibit the kinds of advances made here. See, *In re Ruffalo,* 249 F.Supp. 432, 440–443 (N.D.Ohio 1965).

5. An affidavit and a letter attached to pleadings submitted to this Court show the humanitarian nature of the loans. An affidavit signed by Johnny Ray Jones provides:

> "I, JOHNNY RAY JONES, am 31 years old and married to Arlise Jones; we have two children, Clark, age 6 years, and Johnny Jr., age nine weeks. Mr. Smolen has represented my family for at least 15 years on all my legal problems. I look at Don Smolen as a friend before a lawyer. On November 6, 1989, I asked Mr. Smolen for $100.00 to keep my utilities on. He gave it to me. Then, in February, 1990, I borrowed $60.00 more to help me on my rent. Mr. Smolen never charged me any interest and he helped me when I had no job and was down on my luck. He will always be my friend and lawyer."

A letter written on December 28, 1991, and signed by Marsha Stage provides in pertinent part:

> "... Don, please help me out, I bought a car payed 1,000 on my Son's funeral bill—my kid Xmas. I have to get my License, in order to do that, I have to pay a fine. Don I have no money except to rent an apt. I leave here in 3 wk. with no home, I have to have a place to stay. I will come back to prison if I drive and get stopped. I'm getting a job here at C.S.U. I'll only get pd. once a mo.
> I have to get my license renewed and pay the fine, I did not know I owed this, my case manager checked So I can have and I.D. before I leave. Don, you are my only hope, I have no one I can get the money from. Please loan me $500.00—please, I will go back to prison the first time I get stopped. This is an emergency, I promise I'll pay you $100.00 a mo. until it is payed back, You also have my Indemnity fund, I've already lose 2½ yr. of my life, everything I had.
> All I have is what in my locker here, & a car to go out to. I need a chance, I'm trying real hard to do things right, I have a job waiting I can't get to it, on suspended license's I go to jail, I promise I will pay it back, you can check here if you like.

> Don, I get released *Jan 24,* I owe a fine. My case manager will take me down pay the fine and get my license back. I'm sorry, but after my Son's death, I really didn't know it was owned. Please I'll sign a paper, anything I'll lose my job, if I can't get there, and don I won't even have a way to get there to talk to Richard with Suspended license. this is my only chance to get back on my feet, I have a job-car-apt-all I need is $500.00 to pay this fine.
> Your my only hope Don please help me, so I can try and start my life again.
> You can send the money here my case manager will make arrangements with a C.O. to take me, to pay it and get them renewed.
> Please Don, this is my only chance and your my only hope. I promise you will get it, I'll make payments anything. My job is here in the City...."

6. Rule 1.8(e), Oklahoma Rules of Professional Conduct, 5 O.S.1991, Ch. 1, App. 3–A provides:
> "While representing a client in connection with contemplated or pending litigation, a lawyer shall not advance or guarantee financial assistance to a client, except that a lawyer may advance or guarantee the expenses of litigation, including court costs, expenses of investigation, expenses of medical examination, and costs of obtaining and presenting evidence, provided the client remains ultimately liable for such expenses."

When this rule was adopted by the Court in 1988, I dissented from this portion of the proposed rules. The prohibition against advancing or guaranteeing financial assistance to a client first appeared as a part of the Oklahoma Code of Professional Responsibility on January 1, 1970, subject to an order entered by this Court on December 16, 1969. Prior to that time, constitutional prohibitions against conflicts of interest were in place. Rule 10, 5 O.S.1961, Ch. 1, App. 3 provides:
> "**Acquiring interest in litigation.** The lawyer should not purchase any interest in the subject matter of the litigation which he is conducting."

Rule 42, 5 O.S.1961, Ch. 1, App. 3 provides:
> "**Expenses of litigation.** A lawyer may not properly agree with a client that the lawyer shall pay or bear the expenses of litigation; he may in good faith advance expenses as a matter of convenience, but subject to reimbursement."

Constitutions and the proposed draft of § 48 to the Restatement (Third) Governing Lawyers,[7] I dissent.

Apparently, rule 1.8(e) is grounded in the doctrines of champerty and maintenance. A brief discussion of these concepts is necessary to an understanding of the rule. The common law roots of the doctrines of maintenance and champerty are deeply embedded. The basic notions were present in the legal development of ancient Greeks and Romans, and they became deeply ingrained in the medieval law of England. Movements against the use of champerty and maintenance were a revolt against feudal institutions which required support to the retainers of a feudal magnate despite the justification of a particular action.[8] A champertous agreement is one in which a person lacking an interest in another's litigation finances the suit for personal gain. Champerty is officious intermeddling in litigation in which one has no interest by assisting its prosecution with the intent to derive compensation from the proceeds of the suit.[9]

As early as 1275, the prohibition against maintenance and champerty was applied to royal officers.[10] These restrictions were imposed to check despotism.[11] Lords and other large land holders purchased contested claims against one another, or against commoners. As a defense, the commoners conveyed a portion of their interest in land to some powerful lord to maintain their suit. The nobles' powers grew,[12] they paid far below the *bona-fide* sale price reducing the tenant's profits. As tenants by champert, the nobles were entitled to share in the rents and profits with the grantor.[13] The laws of maintenance and champterty were introduced to protect the commoner against the growing power of the nobles.[14] However, it was not considered maintenance for a rich man to assist a poor man with money or advice in order to enable him to bring or defend an action, provided the assistance was given out of charity.[15] It was not maintenance for an attorney to take money for his advice *or to expend money for his client, if it was to be repaid.*[16] The prohibitions against maintenance and champterty were instituted to prevent the churning up of litigation, the clogging of the courts, and to protect the people. In a strange convolution, the prohibition of Rule 1.8(e) against a lawyer providing financial assistance to a client now places the client at the mercy of more wealthy opponents and of the system. Instead of being forced into rendering up a portion of land to a lord, a modern-day litigant may be forced into an unfair settlement by economic pressures.

Title 21 O.S.1991 § 554 [17] prohibits attorneys from engaging in champertous acts by purchasing any evidence of debt with the intent to sue on the instrument. However, loans to destitute clients for living expenses pending the outcome of litigation have been found not to constitute champerty [18] *especially* if the loan occurs after the

**7.** The Restatement (Third) Governing Lawyers, tentative draft no. 4, § 48, see note 42, infra.

**8.** B. Radin, "Maintenance by Champerty," 24 · Calif.L.Rev. 48–49, 64 (1935–36). See also, *Martin v. Morgan Drive Away, Inc.,* 665 F.2d 598, 603 (5th Cir.1982).

**9.** *Martin v. Morgan Drive Away, Inc.,* see note 8, supra; *Savage v. Seed,* 81 Ill.App.3d 744, 36 Ill.Dec. 846, 401 N.E.2d 984, 989 (1980).

**10.** Statute of Westminster I of 1275; M. Radin, "Maintenance by Champerty," see note 7 at 62.

**11.** *Lytle v. State,* 17 Ark. 608 (1957).

**12.** *Hovey v. Hobson,* 51 Me. 62, 64 (1863).

**13.** B. Radin, "Maintenance by Champterty," see note 8 at 60–61, supra.

**14.** *Hovey v. Hobson,* see note 12 at 65.

**15.** W. Odgers, *The Common Law of England,* v. 1, p. 200 (Sweet & Maxwell, Ltd. 1911).

**16.** *Lytle v. State,* see note 11, supra.

**17.** Title 21 O.S.1991 § 554 provides in pertinent part:
"Any attorney who either directly or indirectly buys or is interested in buying any evidence of debt or thing in action with intent to bring suit thereon is guilty of a misdemeanor...."

**18.** *Dombey, Tyler, Richards & Grieser v. Detroit, Toledo & Ironton R.R. Co.,* 351 F.2d 121, 129 (6th Cir.1965).

attorney-client relationship has been established.[19] Making a loan to a client to cover necessary living expenses is not against public policy [20] or necessarily unethical conduct, per se.[21]

In *Louisiana State Bar Ass'n v. Edwins*, 329 So.2d 437, 445 (La.1976), the Louisiana Supreme Court considered whether a disciplinary rule [22] identical to Rule 1.8(e) prevented a retained attorney from advancing money to a client. In *Edwins*, the attorney had advanced approximately $3,000.00 to a client who used the money for living expenses, to prevent a foreclosure, and to pay for medical treatment. The Louisiana Supreme Court found that neither the spirit nor the intent of the disciplinary rule was violated by the advance or guarantee by a retained lawyer to a client of minimal living expenses, of minor sums necessary to prevent foreclosures, or of necessary medical treatment. The Court went on to find that a construction of the statute which led to a holding that the advances were prohibited would put the rule in constitutional jeopardy. It held that a court-adopted bar disciplinary rule which placed an unreasonable burden upon an individual's right to enforce claims allowed by law might violate the constitutional guarantee of access to courts.[23]

The California Supreme Court has adopted a rule which expressly adopts the position taken by the Louisiana Supreme Court in *Edwins*. Rule 5–104 [24] of the California Rules of Professional Conduct provides that an attorney is not prohibited from loaning money to a client upon the promise of the client to repay the loan once the attorney has been employed.[25] Minnesota has adopted a rule most suited to the protection of the client. Rule 1.8 of the Minnesota Rules of Professional Conduct provides in pertinent part:

"... (c) A lawyer shall not provide financial assistance to a client in connection with pending or contemplated litigation except that ...

(3) a lawyer may guarantee a loan reasonably needed to enable the client to withstand delay in litigation that would

---

**19.** *Hildebrand v. State Bar*, 18 Cal.2d 816, 117 P.2d 860, 863–64 (1941); *Johnson v. Great Northern Ry. Co.*, 128 Minn. 365, 151 N.W. 125, 127 (1915); *Mytton v. Missouri Pac. R.R. Co.*, 211 S.W. 111, 113 (1919).

**20.** *People v. McCallum*, 341 Ill. 578, 173 N.E. 827, 831 (1930).

**21.** *In re Ruffalo*, see note 4 at 443–44, supra. See also, *State v. Dawson*, 111 So.2d 427, 430 (Fla.1959); Annot., "Validity & Propriety of Arrangement by Which Attorney Pays or Advances Expenses of Client," 8 A.L.R.3d 1155, 1176–82 (1966); Comment, "Loans to Clients for Living Expenses," 55 Calif.L.Rev. 1419, 1449 (1967). But see, *Attorney Grievance Comm'n v. Kandel*, 317 Md. 274, 563 A.2d 387, 391 (1989); *Shea v. Virginia State Bar*, 236 Va. 442, 374 S.E.2d 63, 65 (1988); *Matter of Carroll*, 124 Ariz. 80, 86, 602 P.2d 461, 467 (1979); *In re Berlant*, 458 Pa. 439, 328 A.2d 471, 476 (1974), *cert. denied*, 421 U.S. 964, 95 S.Ct. 1953, 44 L.Ed.2d 451 (1975).

**22.** The rule under consideration provided:
"While representing a client in connection with contemplated or pending litigation, a lawyer shall not advance or guarantee financial assistance to his client, except that the lawyer may advance or guarantee the expenses of litigation, including court costs, expenses of investigation, expenses of medical examination, and costs of obtaining and pres-

enting evidence, provided the client remains ultimately liable for such expenses."

**23.** Economic duress may come into play when parties have disproportionate bargaining power and the person with no reasonable alternative succumbs to settlement pressure. See, *Centric Corp. v. Morrison–Knudsen Co.*, 731 P.2d 411, 414–16 (Okla.1986). Here, there is no assertion that the attorney ever instituted collection procedures to collect the loans or forced their repayment.

**24.** Professional Rules, Rule 5–104 provides in pertinent part:
"(A) A member of the State Bar shall not directly or indirectly pay or agree to pay, guarantee, or represent or sanction the representation that he will pay personal or business expenses incurred by or for a client, prospective or existing and shall not prior to his employment enter into any discussion or other communication with a prospective client regarding any such payments or agreements to pay; provided this rule shall not prohibit a member:
... (2) after he has been employed, from lending money to his client upon the client's promise in writing to repay such loan ..."

**25.** The Texas Rules of Professional Responsibility contain no prohibition against the lending of money to a client.

otherwise put substantial pressure on the client to settle a case because of financial hardship rather than on the merits, provided the client remains ultimately liable for repayment of the loan without regard to the outcome of the litigation and, further provided, that no promise of such financial assistance was made to the client by the lawyer, or by another in the lawyer's behalf prior to the employment of that lawyer by the client ..."

This rule allows an advocate to guarantee a loan for a client who might otherwise be forced into an unwanted or unfair settlement. It ensures that the client is able to maintain his/her cause to its conclusion.

We are required under 12 O.S.1991 § 2201(A) to take judicial notice of the United States Constitution and the Constitution of the State of Oklahoma. Title 12 O.S.1991 § 2201 provides in pertinent part:

"A. Judicial notice shall be taken by the court of the common law, constitutions and public statutes in force in every state, territory and jurisdiction of the United States...."

Because Rule 1.8(e) is unconstitutional, discipline may not imposed under the Rule. Rule 1.8(e) potentially violates several sections of both the United States Constitution and the Oklahoma Constitution—the equal protection clause, United States Const. amend. XIV, § 1;[26] access to courts, Okla. Const. art. 2, § 6;[27] the special law clause, Okla. Const. art. 5, § 46;[28] the privileges and immunities clause, Okla. Const. art. 5, § 51;[29] the First Amendment of the United States Constitution;[30] the Okla. Const. art. 1, § 2;[31] and the Okla. Const. art. 2, § 15.[32]

It is interesting to note that the concurring opinion agrees with the position expressed here while admitting that Rule 1.8(e) won't pass constitutional muster. However, these constitutional protections must be applied to this lawyer. We are charged with the duty to take judicial notice of the common law, constitutions and public statutes.[33] The requirement to take

---

**26.** The United States Const. amend. XIV, § 1 provides in pertinent part:

"SECTION 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State ·deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws...."

**27.** The Okla. Const. art. 2, § 6 provides:

"The courts of justice of the State shall be open to every person, and speedy and certain remedy afforded for every wrong and for every injury to person, property, or reputation; and right and justice shall be administered without sale, denial, delay, or prejudice."

**28.** The Okla. Const. art. 5, § 46 provides in pertinent part:

"The Legislature shall not, except as otherwise provided in this Constitution, pass any local or special law authorizing:
... Regulating the practice ... before the courts ..."

**29.** The Okla. Const. art. 5, § 51 provides:

"The Legislature shall pass no law granting to any association, corporation, or individual any exclusive rights, privileges, or immunities within this State."

**30.** The United States Const., amend. 1 provides:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

**31.** The Okla. Const. art. 1, § 2 provides:

"Perfect toleration of religious sentiment shall be secured, and no inhabitant of the State shall ever be molested in person or property on account of his or her mode of religious worship; and no religious test shall be required for the exercise of civil or political rights. Polygamous or plural marriages are forever prohibited."

**32.** The Okla. Const. art. 2, § 15 provides:

"No bill of attainder, ex pose facto law, nor any law impairing the obligation of contracts, shall ever be passed. No conviction shall work a corruption of blood or forfeiture of estate: Provided, that this provision shall not prohibit the imposition of pecuniary penalties."

**33.** Title 12 O.S.1991 § 2201 provides in pertinent part:

"A. Judicial notice shall be taken by the court of the common law, constitutions and

judicial notice of the constitution is mandatory.[34] The notice the Court is required to take of constitutional provisions may be taken at any stage of a proceeding.[35] We have previously recognized the duty to take judicial notice of constitutional, fundamental rights in disciplinary proceedings in *State ex rel. Oklahoma Bar Ass'n v. Lobaugh,* 781 P.2d 806, 810 (Okla.1988). In *Lobaugh,* we addressed the issue of a lawyer's right to be heard during a hearing before a trial panel. In doing so, the Court stated that even if the issue of the right to be heard had not been preserved properly before the trial panel, it would have fallen to this Court to remedy a manifest miscarriage of fundamental due process.

It is well established in our jurisprudence that public law issues may be resolved by the application of legal theories not tendered below.[36] It is this Court's duty to the public to protect it from the wrongful acts of unscrupulous and dishonest attorneys.[37] The exclusive power to prescribe rules for conduct, to discipline attorneys, and to revoke licenses to practice law rests with this tribunal.[38] We cannot impose rules upon the practicing bar which we recognize as unconstitutional when we are the final arbiters of those rules and the only entity cloaked with the power to alter

them. We are the institution responsible for the continued public confidence in the practicing bar. The disciplining of attorneys is a public issue of great interest.[39]

We may not ignore the untenable position of an attorney faced with disciplinary proceedings. Because of economic duress, the attorney, even if believing there is a valid defense to the charge, may opt in the form of a plea bargain to take a humiliating and embarrassing sanction in the form of a public censure rather than face total jeopardy and the unknown. Faced with de novo review,[40] the attorney may opt for an unpalatable compromise in an effort simply to get the Bar Association removed from the process.

Nevertheless, *attorneys should not be allowed to establish a pecuniary gain by overreaching.* This result can be avoided by reinstitution of Rule 10 and Rule 42 [41] or by the adoption of the proposed § 48 to the Restatement (Third) Governing Lawyers which restricts advances to clients to circumstances in which a "... loan is needed to enable the client to withstand delay in litigation that otherwise might unjustly induce the client to settle or dismiss a case because of financial hardship rather than on the merits....." [42]

---

public statutes in force in every state, territory and jurisdiction of the United States...."

**34.** Use of "shall" by the Legislature is normally considered as a legislative mandate equivalent to the term "must," requiring interpretation as a command. *Fuller v. Odom,* 741 P.2d 449, 453 (Okla.1987).

**35.** Title 12 O.S.1991 § 2203 provides in pertinent part:
"... C. Judicial notice may be taken at any stage of a proceeding."

**36.** *Matter of McNeely,* 734 P.2d 1294, 1296 (Okla.1987) [Authored by Opala, C.J.]; *Davis v. Davis,* 708 P.2d 1102, 1104 (Okla.1985) (Overruled on other grounds.) [Authored by Opala, C.J.].

**37.** *In re Rice,* 167 Okla. 330, 29 P.2d 599 (1934).

**38.** *State ex rel. Oklahoma Bar Ass'n v. O'Bryan,* 385 P.2d 876, 888 (Okla.1963), *cert. denied,* 376 U.S. 649, 84 S.Ct. 983, 11 L.Ed.2d 980 (1963).

**39.** See, *R.J. Edwards v. Hert,* 504 P.2d 407, 409 (Okla.1972) [Concerning questions relating to

the unlicensed practice of law, this Court refered to "the importance of the issues raised to the due administration of justice and to the protection of the public welfare."].

**40.** *State ex rel. Oklahoma Bar Ass'n v. Lacoste,* 813 P.2d 501, 503 (Okla.1991).

**41.** Rule 10, 5 O.S.1961, Ch. 1, App. 3, see note 6, supra and Rule 42, 5 O.S.1961, Ch. 1, App. 3, see note 6, supra and accompanying discussion.

**42.** The Restatement (Third) Governing Lawyers, tentative draft no. 4, § 48 (April 10, 1991) provides in pertinent part:
**"§ 48. Forbidden Client–Lawyer Financial Arrangements**
(1) A lawyer may not acquire a proprietary interest in the cause of action or subject matter of litigation that the lawyer is conducting for a client, except that the lawyer may:
(a) Acquire a lien as provided by § 55 to secure the lawyer's fee or expenses; and
(b) Contract with a client for a contingent fee in a civil case except when prohibited as stated in § 47.

Neither the United States Constitution nor the Constitution of the State of Oklahoma delineate the effective date of judicial opinions. Subject to limited exceptions, decisions were given retrospective effect at common law.[43] The United States Supreme Court has broadly endorsed variations in juristic philosophy involving retrospective and prospective decisions.[44] The decision to apply a new rule retrospectively is one of judicial policy.[45] Retroactive application of a newly announced rule is the traditional common-law approach, ráther than the exception.[46] In determining whether to give a rule retrospective application, three factors are considered: 1) whether the rule announced is a new principle of law; 2) whether retrospective application would retard operation of the rule; and 3) whether retroactive application would produce an inequitable result.[47] The language of the new rule would clearly change the prior language of rule 1.8(e), allowing client loans in restricted circumstances. Retrospective application of the new rule would not retard its operation or produce an inequitable result.

I would urge our revisitation of rule 1.8(e). We should adopt a version similar to the Restatement's proposed § 48 in place of its presently unconstitutional coun-

> (2) A lawyer may not make or guarantee a loan to a client in connection with pending or contemplated litigation that the lawyer is conducting for the client, except that the lawyer may:
> (a) Advance or guarantee a loan covering court costs and expenses of litigation, the repayment of which to the lawyer may be contingent on the outcome of the matter; and
> (b) Make or guarantee a loan on fair terms, the repayment of which to the lawyer may be contingent on the outcome of the matter, if the loan is needed to enable the client to withstand delay in litigation that otherwise might unjustly induce the client to settle or dismiss a case because of financial hardship rather than on the merits...."

**43.** *Robinson v. Neil,* 409 U.S. 505, 507, 93 S.Ct. 876, 877, 35 L.Ed.2d 29, 32 (1973).

**44.** *Great Northern R. Co. v. Sunburst,* 287 U.S. 358, 364, 53 S.Ct. 145, 148, 77 L.Ed. 360, 366, 85 A.L.R. 254, 260 (1932).

terpart. The Okla. Const. art. 2, § 6[48] guarantees that the courts of justice shall be open to every person. Adoption of a rule consistent with the draft of § 48 would allow attorneys' to ensure that the courthouse doors stay open for their economically disadvantaged litigants. The rule would not require any attorney to loan money to any client. However, it would allow an attorney to make a loan to a client to ensure that the client is not forced into an early and disadvantageous settlement by the strong arm of a powerful defendant, thereby reinforcing public confidence in the adversarial system.

OPALA, Chief Justice, with whom HODGES, Vice Chief Justice, joins, concurring.

In this Bar prosecution for professional misconduct, the court visits public censure upon the Respondent-lawyer, approving the sanction counseled by the Professional Responsibility Tribunal. That body rested its recommendation on the parties' submission by *stipulated facts* and on their *agreed choice of discipline.* The charges under consideration stem from Respondent's loan-making to clients in violation of Rule 1.8(e).[1] The cited rule prohibits legal practitioners from providing financial assis-

**45.** *McGehee v. Florafax Int'l, Inc.,* 776 P.2d 852, 854 (Okla.1989); *Thompson v. Presbyterian Hosp., Inc.,* 652 P.2d 260, 268 (Okla.1982).

**46.** *Cox v. Brockway, Inc.,* 708 P.2d 1085, 1088 (Okla.1985).

**47.** *Kay Elec. Coop. v. Oklahoma Tax Comm'n,* 815 P.2d 175, 177 (Okla.1991); *McGehee v. Florafax Int'l, Inc.* see note 45 at 854, supra.

**48.** The Okla. Const. art. 2, § 6, see note 27, supra.

**1.** Rule 1.8(e), Rules of Professional Conduct, 5 O.S.1991, Ch. 1, App. 3–A, provides:
"While representing a client in connection with contemplated or pending litigation, a lawyer *shall not advance or guarantee financial assistance to a client,* except that a lawyer may advance or guarantee the expenses of litigation, including court costs, expenses of investigation, expenses of medical examination, and costs of obtaining and presenting evidence, provided the client remains ulti-

tance to clients, except in certain narrowly defined instances.[2] I concur in today's imposition of recommended discipline and I write separately to explain why I am unable to join the dissent which calls for this court's retrospective invalidation of Rule 1.8(e) on grounds of constitutional infirmity and for Respondent's exoneration. My counsel is that a reexamination of Rule 1.8(e) be done *via* a Bar's legislative-type study rather than by this court acting *sua sponte* through the process *of judicature* that employs jurisprudence to effect *retrospective changes*[3] in the rules of professional ethics.

### CRITICAL FACTS

According to the record,[4] Respondent made loans of $79,304.00 to 161 different clients during an 18–month period. He *concedes* his conduct violates Rule 1.8(e) and interposes in mitigation that the loans did not bear interest and were made to destitute clients for humanitarian reasons.

mately liable for such expenses." (Emphasis added.)

**2.** *See e.g. Oklahoma Bar Ass'n v. Boettcher,* Okl., 798 P.2d 1077, 1078 (1990).

**3.** Shaping ethics rules for the Bench and Bar is the Supreme Court's *constitutional* exercise of *legislative* power. *Supreme Court of Virginia v. Consumers Union of the United States,* 446 U.S. 719, 731, 100 S.Ct. 1967, 1974, 64 L.Ed.2d 641 (1980); *Tweedy v. Oklahoma Bar Ass'n,* Okl., 624 P.2d 1049, 1052–1053 (1981). Lawmaking function, whether by the Legislature *or* by this court, must be carried out in conformity to our Constitution. Substantive legislation *may not be changed to govern a claim or defense in a pending judicial proceeding.* Art. 5, § 52, Okl. Const. A *proceeding begun* under norms of substantive statutory law then in force remains unaffected by after-enacted legislative changes. Art. 5, § 54, Okl. Const.; *First Nat. Bank of Pauls Valley v. Crudup,* Okl., 656 P.2d 914, 916–917 (1983). *The dissent would have this court effect a legislative change in the substantive norms of our Bar ethics and make it apply to this pending case in contravention of Art. 5, §§ 52 and 54, Okl. Const.*

**4.** The pertinent provisions of the AGREED STIPULATIONS OF FACT AND CONCLUSIONS

### I

## IN DISCIPLINARY PROCEEDINGS AGAINST A LAWYER THIS COURT WILL NOT TEST BAR–INVOKED ETHICS RULES FOR CONFORMITY TO FUNDAMENTAL LAW, ABSENT RESPONDENT'S TIMELY CHALLENGE

### A

Limits Upon *Sua Sponte* Consideration Of Constitutional And Public–Law Issues

The dissent concludes Respondent's conduct should be viewed as neither champertous or against public policy, nor unethical *per se,* because Rule 1.8(e) contravenes state and federal fundamental law. While this position is not utterly without merit, I cannot join today in calling for Rule 1.8(e)'s retrospective invalidation.

*Sua sponte* consideration of a constitutional question which was neither advanced by the briefs nor preserved in the record offends two cardinal precepts of constitutional adjudication: (1) a court should never decide a fundamental-law question in ad-

OF LAW WITH AGREED RECOMMENDATION FOR DISCIPLINE are:

"* * * *AGREED FINDINGS OF FACT AS TO COUNT I*

5. Between June 6, 1989, and December 28, 1990, Respondent loaned $79,304.00 to 161 different clients.

6. During this same time Respondent earned $1,481,000 on gross receipts of $5,778,-000, including client's share, and represented more than 1,600 clients.

*AGREED CONCLUSIONS OF LAW AS TO COUNT I*

7. Respondent's conduct violated the mandatory provisions of Rule 1.8(e), Oklahoma Rules of Professional Conduct, to wit: * * *

*AGREED MITIGATION*

9. The loans made by Respondent were non-interest bearing. Respondent loaned money for humanitarian reasons to clients who were destitute, without other means and resources or credit to obtain loans for sustenance during the pendancy [sic] of their disability and in many cases could not work because of their injury. * * *

*AGREED RECOMMENDATION FOR DISCIPLINE*

11. As discipline in this matter, Respondent should receive a public censure from the Oklahoma Supreme Court. * * *"

vance of strict necessity nor formulate a norm of constitutional law broader than is required by the precise facts to which it is to be applied [5] and (2) a court should not overstep the limits of the *Reynolds v. Special Indemnity Fund* [6] exception.

*Reynolds* teaches that if in a public-law controversy the aggrieved party's brief *advances* the wrong reason for reversal, the reviewing court is free to *grant corrective relief from the urged error on an applicable theory chosen sua sponte*—i.e., a theory that supports *the assigned error* but was neither advanced below nor on appeal and *is dispositive of the issue raised by the aggrieved party. Reynolds* is inappo-

site here. *Our Reynolds freedom to choose sua sponte the dispositive public-law theory when a wrong one is proffered does not extend to identifying a constitutional flaw* [7] *not urged by the aggrieved party either here or below.* Unlike jurisdictional infirmities, into whose presence we must examine even when they are not urged upon us by the parties,[8] constitutional flaws may not be corrected in the appellate process *sua sponte.*

Respondent entered into a stipulation with the Bar, which neither questions the outer limit of Rule 1.8(e)'s champerty definition [9] nor its applicability to the instant

---

**5.** The prudential rule of necessity, adhered to by all state and federal courts, *commands that constitutional issues not be resolved in advance of strict necessity. In re Snyder,* 472 U.S. 634, 642–643, 105 S.Ct. 2874, 2880, 86 L.Ed.2d 504 (1985); *Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 501–502, 105 S.Ct. 2794, 2801, 86 L.Ed.2d 394 (1986); *I.N.S. v. Chadha,* 462 U.S. 919, 937, 103 S.Ct. 2764, 2776, 77 L.Ed.2d 317 (1983); *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring); *In re Initiative Petition No. 347 State Question No. 639,* Okl., 813 P.2d 1019, 1037 (1991) (Opala, C.J., concurring); *Smith v. Westinghouse Elec. Corp.,* Okl., 732 P.2d 466, 467 n. 3 (1987); *Schwartz v. Diehl,* Okl., 568 P.2d 280, 283 (1977); *Dablemont v. State, Department of Public Safety,* Okl., 543 P.2d 563, 564–565 (1975); *see also Davis v. B.F. Goodrich,* Okl., 826 P.2d 587, 593–594 (1992) (Opala, C.J., concurring); *In re Initiative Petition No. 348,* Okl., 820 P.2d 772, 781, 782 n. 4 (1991) (Opala, C.J., concurring in result); *Johnson v. Walters,* Okl., 819 P.2d 694, 708, 712 n. 26 (1991) (Opala, C.J., concurring in part and dissenting in part); *State ex rel. Okl. Bar Ass'n v. Lobaugh,* Okl., 781 P.2d 806, 813 (1988) (Opala, J., dissenting); *In re Initiative Petition No. 341,* Okl., 796 P.2d 267, 275 (1990) (Opala, V.C.J., concurring in result).

If no constitutional challenge has been advanced, the dictates of fairness are not impugned by the court's denial of *sua sponte* consideration. *"We do not reach for constitutional questions not raised by the parties." Mazer v. Stein,* 347 U.S. 201, 206 n. 4, 74 S.Ct. 460, 464, 98 L.Ed. 630 (1954) (emphasis mine); *Andrews v. Louisville & Nashville Railroad Company,* 406 U.S. 320, 324–325, 92 S.Ct. 1562, 1565, 32 L.Ed.2d 95 (1972). *See also,* BENJAMIN CARDOZO, THE NATURE OF THE JUDICIAL PROCESS 30–31 (1921); EDWIN W. PATTERSON, JURISPRUDENCE § 4.62, at 533 (1953).

**6.** *Special Indemnity Fund v. Reynolds,* 199 Okl. 570, 188 P.2d 841, 842 (1948). *See Reynolds v. Special Indem. Fund,* Okl., 725 P.2d 1265, 1270

(1986), for application of the *Reynolds* public-law issue exception.

**7.** Extant jurisprudence allowing in a public-law controversy consideration of theories that were not briefed presents a different question. *See Matter of McNeely,* Okl., 734 P.2d 1294 (1987); *Davis v. Davis,* Okl., 708 P.2d 1102 (1985). In both *McNeely* and *Davis,* the challenges we considered were raised below. What we provided there was independent argument in support of the challenges the parties pressed for reversal of the trial tribunal's decision. These examples are distinguishable from that presented by this case. Here *no error was assigned either below or in the appellate court.* Neither does extant case authority permitting, in a public-law controversy, consideration of a *constitutional issue* not dealt with at nisi prius lend support to the dissenting view. The constitutional flaw reached in those cases, though not urged in the trial tribunal, *was clearly assigned as error before the appellate court. See e.g. Simons v. Brashears Transfer and Storage,* Okl., 344 P.2d 1107, 1113 (1959); *First Nat'l Bank v. Southland Prod. Co.,* 189 Okl. 9, 112 P.2d 1087, 1098 (1941), citing *Magnolia Pet. Co. v. State,* 175 Okl. 11, 52 P.2d 81 (1935), *Shaffer Oil & Refining Co. v. County Treasurer,* 175 Okl. 6, 52 P.2d 76 (1935).

**8.** This court must inquire *sua sponte* into its jurisdiction. *Cate v. Archon Oil Co., Inc.,* Okl., 695 P.2d 1352, 1356 (1985); *Pointer v. Hill,* Okl., 536 P.2d 358, 361 (1975).

**9.** Champerty is the ancient name for a doctrine that prohibits a person from trafficking in another's litigation interest. Black's Law Dictionary defines it as: "A bargain by a stranger with a party to a suit, by which such third person undertakes to carry on the litigation at his own cost and risk, in consideration of receiving, if successful, a part of the proceeds or subject sought to be recovered. *Schnabel v. Taft Broadcasting Co., Inc.,* Mo.App., 525 S.W.2d 819, 823." *Id.* at 209 (5th Ed.1979).

disciplinary proceeding. Champerty—*qua* criminal offense—is regulated by statute, 21 O.S.1991 § 554.[10] It is also an ethics violation under Rule 1.8(e).[11] Conduct falling within the purview of § 554 is punishable as a misdemeanor; acts or omissions which come within the ambit of Rule 1.8(e) constitute a disciplinary infraction.[12] *The constitutional infirmities pressed by the dissent went unnoticed and unchampioned both here and below.*[13] We do not have a roving commission to invalidate the Bar prosecutor's plea bargains based on an uninvoked constitutional infirmity. Absent a finely targeted challenge by the accused legal practitioner, I would not test here Rule 1.8(e)'s fundamental-law or public-policy orthodoxy.

Furthermore, in the face of the prosecuted lawyer's silence, I cannot today decide to what extent, if any, the court is bound by the broadly articulated champerty prohibition in § 554. While in crafting a Bar

ethics rule we are prone to view ourselves as entirely free from the restraint of that penal statute—because in regulating the practice of law and the conduct of lawyers this court casts itself in the status of an *exclusive* constitutional law-making body [14]—an uncompromisingly absolutist position may be fraught with appreciable danger.[15]

### B.

### Section 2201's "Judicial Notice" Requirement Must Be Invoked By Use Of Adversary Process

Section 2201 [16] of the Oklahoma Evidence Code [17] requires us to take "judicial notice" of law that is invoked in the adversary process.[18] Judicial notice means only that we *dispense with proof* of state and federal law—common, constitutional, or statutory law.[19] Judicial notice stands in the place of proof and makes evidence unnecessary.[20]

*See* in this connection Annot., Validity and Propriety of Arrangement By Which Attorney Pays Or Advances Expenses Of Client, 8 A.L.R.3d 1155, 1158 (1966).

**10.** The pertinent terms of 21 O.S.1991 § 554 are: "Any attorney who either directly or indirectly buys or is interested in buying any evidence of debt or thing in action with intent to bring suit thereon is guilty of a misdemeanor...."

**11.** For the text of Rule 1.8(e), *see supra* note 1.

**12.** In *Oklahoma Bar Ass'n v. Boettcher, supra* note 2, the respondent-lawyer was charged with violating DR 5–103(B), 5 O.S.1981, Ch. 1, App. 3, the pre-Code counterpart of Rule 1.8(e). *Boettcher, like the present case,* came to us on the parties' submission by stipulated facts and agreed recommendation for discipline. In *both* cases the parties concede that the disciplinary rule was violated and recommend that public reprimand be imposed as the respondent's disciplinary sanction.

**13.** *See* Agreed Stipulations, *supra* note 4.

**14.** *Tweedy v. Oklahoma Bar Ass'n, supra* note 3 at 1054–1055.

**15.** Although this court claims for itself a constitutionally invested power to regulate the ethics of lawyers to the exclusion of the legislature, *it may not ignore* § 554's outer limit and the judicial gloss placed upon it by the Court of Criminal Appeals. Were the prohibition of § 554 appreciatively more extensive than the permissible conduct allowed under the ethics rules, lawyers might be subject to criminal accountability

for acts or omissions which would not offend professional discipline. A sweep of criminal interdiction that is more expansive than the range of a lawyers' professional freedom *must be avoided* and the risk of conflict between criminal and ethical accountability minimized.

**16.** The terms of 12 O.S.1991 § 2201(A) are: "A. Judicial notice shall be taken by the court of the common law, constitutions and public statutes in force in every state, territory and jurisdiction of the United States."

**17.** 12 O.S.1991 §§ 2101 et seq.

**18.** When somebody invokes state or federal law, we must "notice" it. *Benham v. Keller*, Okl., 673 P.2d 152, 153 (1983).

**19.** For the rule governing judicial notice of a foreign country's laws, *see Panama Processes v. Cities Service Co.*, Okl., 796 P.2d 276, 294–295 (1990); McCormick on Evidence § 335 at 413–415 (4th Ed.1992).

**20.** S. Gard, 1 Jones on Evidence, § 2:1 at 30 (1972). "Judicial notice is the cognizance of certain facts which a judge or jury may properly take or act upon without proof because they are already known to them.... [I]t takes the place of evidence, since it stands for the same thing...." *Id.,* § 2:1 at 30. "The device of judicial notice allows certain specified facts to be established without the introduction into the record of supportive evidence." G. Lilly, An Introduction to the Law of Evidence, § 7 at 10. "[J]udicial notice

That principle will not aid *this* Respondent in *this* disciplinary proceeding. Judicial notice *of law* is distinguishable from judicial notice *of an infirmity* in the adversary process. We do not take judicial *notice of an infirmity* the aggrieved party has not targeted as a reversible flaw.[21] The requirement that we dispense with the proof of domestic law does not alter the adversary character of a bar disciplinary proceeding.[22]

Here the Respondent did not seek to avoid discipline on the grounds that the source of law which is the foundation of this proceeding—Rule 1.8(e)—is either legally or constitutionally infirm. We cannot *sua sponte* give this Respondent the *benefit of an infirmity* that was not pressed in an adversary context.

### C.

### Limits Upon *Sua Sponte* Consideration Of A Disciplinary Proceeding Concluded By The PRT Upon A Plea Bargain

Another troubling question is how far the court should go in raising constitutional issues *sua sponte* when, as here, discipline

is recommended on the basis of a plea bargain.[23]

I would give the plea bargain a four-corners' examination for not more than a *superficial* conformity to fundamental law and public policy. I would *withhold judicial approbation* from but a narrow class of agreed dispositions—(a) those in which discipline is *too lenient or too severe, (b) those where* the *disposition* sought to be effected is *facially fraught with some fatal fundamental-law flaw,* or (c) those *where the result* would otherwise clearly *contravene public policy.*[24] I would *be loath ever to upset* a plea bargain by raising *sua sponte* some nonfacial fundamental-law infirmity in a case like this which tenders for imposition but a *mild form* of discipline.

### II

### THE RESTATEMENT (THIRD) GOVERNING LAWYERS

Support for the dissent's view is found in the *tentative draft* of the Restatement (Third) Governing Lawyers,[25] § 48, which

is a substitute for formal proof, that is, it relieves counsel from the obligation formally to introduce evidence to support a noticed fact.... [J]udicial notice is a device that both expedites the trial of a case and serves as a method by which the judge can prevent highly improbable findings of fact by the jury. *Id.,* § 7 at 13. "The term 'judicial notice' often is applied to the process by which a judge, usually with the assistance of counsel, determines or discovers the procedural or substantive law in his or some other jurisdiction. Usually there is a recourse to statutes, court rules, or cases that are referenced by citation without any need to introduce into evidence the original (or copies) of the pertinent material." *Id.* § 7 (Notes, Judicial Notice of Law) at 15.

**21.** *Davis v. B.F. Goodrich, supra* note 5 at 593.

**22.** *State ex rel. Okl. Bar Ass'n v. Lobaugh, supra* note 5 at 813 (Opala, J., dissenting).

**23.** *See* in this connection *State ex rel. Oklahoma Bar Ass'n v. Lacoste,* Okl., 813 P.2d 501, 506–507 (1991) (Opala, C.J., dissenting).

**24.** In *State ex rel. Oklahoma Bar Ass'n v. Lacoste, supra* note 23, the respondent-lawyer was charged with misrepresentations to a third party and making false statements to the Bar in the

course of its investigation. There, I expressed the view that the one-year suspension imposed on the respondent was too harsh when compared to a similar sanction visited upon a lawyer for inflicting gross economic harm upon his clients. Our constitutional responsibility to review bar prosecutions is discharged by giving a meaningful and fair *de novo* review of the recommended sanction's correctness. *Id.,* at 506 (Opala, C.J., dissenting).

**25.** The Restatement (Third) Governing Lawyers, tentative draft no. 4, § 48, pgs. 224–225 (April 10, 1991) states:

"**§ 48. Forbidden Client–Lawyer Financial Arrangements**

(1) A lawyer may not acquire a proprietary interest in the cause of action or subject matter of litigation that the lawyer is conducting for a client, except that the lawyer may:

(a) Acquire a lien as provided by § 55 to secure the lawyer's fee or expenses; and

(b) Contract with a client for a contingent fee in a civil case except when prohibited as stated in § 47.

(2) A lawyer *may not make or guarantee a loan to a client in connection with pending or contemplated litigation* that the lawyer is conducting for the client, *except that the lawyer may:*

restricts advances to clients to circumstances in which the client needs financial assistance to avoid a coerced settlement. Comment d to § 48 notes that while loans to clients beyond litigation expenses are forbidden in most jurisdictions, "they are justified when needed to help a financially pressed client proceed with a suit rather than accepting whatever settlement may be offered. A client whose resources may have been depleted by an injury giving rise to a suit may have difficulty obtaining food, clothing, shelter and medical treatment during protracted litigation." The same comment adds that banks and other lending institutions "will usually be unwilling to lend on the security of a lawsuit because assessing the claim's probable worth is often difficult and champerty law may prohibit acquiring an interest in the cause of action as security." The text of the cited comment concludes that on balance, "it is better for the loan to be permitted than for the client to be saved from conflicts of interest but forced by need to abandon the suit." [26]

*I would, as the dissent urges, favor a reexamination of Rule 1.8(e)* in light of the quoted tentative draft of Restatement (Third). But today, I would counsel the

court either (a) to await the final text of Restatement before launching an all-out *legislative drive* [27] for the Rule's change or (b) to have a Bar committee formulate an *interim revision* of Rule 1.8(e) to become effective pending adoption of the *final* text of Restatement.

## CONCLUSION

While this Respondent may be deserving of total exoneration on the basis of infirmities urged in the dissent, I cannot, in the absence of a lively controversy, join today in *sua sponte* consideration of any constitutional issue nor in withholding my *imprimatur* from the PRT-approved plea bargain. There are here no fatal and facially apparent public-policy or fundamental-law defects. In light of recent trends exemplified by § 48 of Restatement (Third), I would strongly favor a re-examination of Rule 1.8(e), with a view to relaxing its restrictive scope. My counsel to the court is *not* so much against abuse of *judicial process* but more so against *misuse of our legislative authority*. The appeal I make is *for an orderly change* in the course of charting the permissible bounds of lawyers'

> (a) Advance or guarantee a loan covering court costs and expenses of litigation, the repayment of which to the lawyer may be contingent on the outcome of the matter; and
> (b) Make or guaranty a loan on fair terms, the repayment of which to the lawyer may be contingent on the outcome of the matter, if the loan is needed to enable the client to withstand delay in litigation that otherwise might unjustly induce the client to settle or dismiss a case because of financial hardship rather than on the merits. \* \* \* " (Emphasis added.)

**26.** The Reporter's Note to § 48 (comment d) observes that "[s]ome authority allows lawyers to advance living expenses to their clients so long as that is not done or promised before the lawyer is retained. E.g., Ala. Rules of Prof. Conduct, Rule 1.8; California Rules of Professional Conduct, Rule 4–210(A)(2) (lawyer may lend to client); N.D. Rules of Prof. Conduct, Rule 1.8(e) (lawyer may guarantee loan to client); *People v. McCallum,* 341 Ill. 578, 173 N.E. 827 (1930); *In re Sizer,* 306 Mo. 356, 267 S.W. 922 (1924); *Johnson v. Great Northern Ry.,* 128 Minn. 365, 151 N.W. 125 (1915). See also Texas Code of Professional Responsibility, DR 5–103 (omitting all prohibitions of advances to client); Commission on Professional Responsi-

bility, Roscoe Pound–American Trial Lawyers Foundation, The American Lawyer's Code of Conduct, Rule 5.6(a) (1980) (allowing advances to client on any terms that are fair)." The § 48 restriction on advances to clients "derives from Minnesota Rules of Professional Conduct, Rule 1.8(e)(3); *Louisiana State Bar Assoc. v. Edwins,* 329 So.2d 437 (La.1976)." The Note further observes that "[m]ost jurisdictions ... bar all loans of living expenses. E.g., *In re Carroll,* 124 Ariz. 80, 602 P.2d 461 (1979); 1 G. Hazard & W. Hodes, The Law of Lawyering 274–75 (2d ed. 1990)." *Id.* at 230–231.

**27.** The responsibility for legislation, prosecution and adjudication in the entire arena of legal practitioners' professional discipline is constitutionally reposed in the judicial department. The Bar's conduct is governed by rules which are promulgated by this court in the exercise of its *legislative* function as the Bar's regulator. This law making function is to be distinguished and separate from that which attends an exercise of our jurisdiction as the sole and final arbiter of the practitioner's status for audience before Oklahoma courts. In the latter capacity this court acts not as a *legislator* but rather *qua adjudicator. Tweedy v. Oklahoma Bar Ass'n, supra* note 3 at 1052–1055.

conduct. It should be done by our *measured and restrained legislative response after* full consultation with the Bench, the practising Bar as well as with the academic legal community.